**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BAINBRIDGE FUND LTD.,

Plaintiffs,

v.

THE REPUBLIC OF ARGENTINA,

Defendant.

Civil Case No. 1:16-cv-08605-LAP

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR INJUNCTION AND TURNOVER**

DUANE MORRIS LLP
1540 Broadway
New York, NY 10036
(212) 692-1000
*Counsel for Plaintiff Bainbridge Fund Ltd.*

## INTRODUCTION[1]

Plaintiff requests that the Court order the Republic of Argentina (the "Republic") to turn over its (i) 100% shareholding in Class A shares of YPF S.A., (ii) it's 51% shareholding in Class D shares of YPF S.A., and (iii) any Republic assets currently held by the Bank of New York Mellon ("BNYM") in New York which represent receipts from the American Depositary Receipt ("ADR") program or American Depositary Shares ("ADSs") relating to such YPF Shares, in satisfaction of the Court's judgment in this action (the Class A shares, Class D shares, ADR Receipts, and ADS shares are collectively referred to herein as the "YPF Assets").

Before the Court, through this motion, is an opportunity to satisfy enforcement of a judgment that has been evaded by the Republic at every turn since it was entered on December 1, 2020. The legal and factual framework presented in this motion provide a direct path towards doing so.

From a legal standpoint, there is no dispute that the Argentine Federal Government owns 100% of YPF's Class A shares and 51% of YPF's Class D shares. This has been reflected both in YPF's own financial reporting and in its shareholder meeting reporting.[2] The ADRs, ADSs, and a portion of the Class D shares are in the United States, while the remainder and the Class A shares are held in Argentina. This Court has held that it has the authority under New York law to order the Republic to bring its extraterritorial property into the United States, if the property was not

[1] Note that this motion contains substantially similar arguments and supporting documentation to the Motion for Injunction and Turnover filed in *Petersen Energía Inversora, S.A.U. v. Argentine Republic and YPF S.A.*, No. 15 Civ. 2739 (LAP) and *Eton Park Capital Management, L.P. v. Argentine Republic and YPF S.A.*, No. 16 Civ. 8569 (LAP) in this Court (collectively, "Peterson YPF"), ECF No. 481–85, which will be referred to throughout this motion.

[2] The Republic owns 200,589,525 Class D shares of YPF, representing 51.000% of YPF's total share capital and 3,764 Class A shares of YPF, which represent 100% of the Class A shares. YPF Form 20-F for 2023, at 90 (Costantini Declaration, Ex. 1).

immune from execution under the FSIA afterward. The YPF Assets plainly would not be immune: they are the paradigm of an asset used for a commercial activity, and the Republic has clearly used and continues to use the assets for commercial activity in the United States.

The procedural framework for this motion is also clear. The Court simply needs to order the Republic to (i) transfer its Class A and Class D shares of YPF into a global custody account at BNYM in New York and (ii) instruct BNYM to turn over the shares, including any amounts currently held by BNYM representing the Republic's ADR receipts or ADSs relating to such shares, to Plaintiff or its designees. There is ample legal precedent for such orders in favor of judgment-creditors.

Plaintiff has faced continuous adversity with respect to the enforcement of this Court's judgment against the Republic, and will continue to lack any prompt form of relief if forced to do so through compulsory process, given the Republic's many years of structuring its assets to avoid enforcement. The YPF Assets, however, are unique in their ease of access.

The material facts in this case are not subject to dispute. The Republic holds 100% of YPF's Class A shares. The Republic holds 51% of YPF's Class D shares in book-entry form in an account at Caja de Valores, S.A., Argentina's central securities depository (its equivalent of the U.S.'s Depository Trust Company ("DTC")).

At issue in this case is the enforcement of the $95,424,899.38.00 judgment entered by this Court on December 1, 2020 against the Republic on Bainbridge's claim to relief with respect to the "US040114GG96 Bonds" (the "Judgment"). ECF No. 41. As set out in the Memorandum & Order Denying Bainbridge's Turnover Motion Pursuant to FRCP 69(a)(1) and CPLR 5225(a) entered into in this case on September 6, 2023 ("Turnover Order"), the underlying Form of Securities Agreement and Specimen Note executed by the Republic on the bonds at issue in this case, which are governed

by the 1994 Fiscal Agency Agreement (the "FAA"), include specific waivers relating to judgment, attachment, and execution. *See* ECF No. 95 at 2–4.

In the Turnover Order, this Court held that the Foreign Sovereign Immunities Act ("FSIA") "does not supersede" its authority under New York law to order a foreign state to turn over an extraterritorial asset in full or partial satisfaction of a federal judgment. ECF No. 95 at 9. The Court concluded that the "prudent" course was "to evaluate whether the assets are subject to execution immunity before ordering that they be brought to the United States." *Id.* at 10–11. Putting aside any assets that are already here, whether the foreign assets are subject to execution immunity depends solely on whether the assets were "used for a commercial activity in the United States" under 28 U.S.C. § 1610(a), since the Republic has already waived its immunity. *Id.* at 16. Plaintiff's motion presents the Court with a singular legal question: whether the YPF Assets are "used for a commercial activity in the United States," 28 U.S.C. § 1610(a). The answer to this question is yes.

The Republic uses its YPF Assets to direct substantial commercial activity in the United States. The Republic has managed YPF as its controlling shareholder since 2012, when it expropriated 51% of YPF's Class D shares from Repsol S.A. *Petersen II*, 2023 WL 2746022, at *3. The Republic holds additional controlling rights, including liquidation, voting, and veto rights and the ability to appoint Board members, through its 100% ownership of YPF's Class A shares. By virtue of its majority position, the Republic appoints YPF's Chairman and a majority of the members of its Board of Directors and exercises control over YPF's major corporate actions, using this control to direct numerous capital-raising activities in the United States. Among others, The Republic has used its majority shares to cause YPF to: (1) solicit U.S. investment in its Class D shares through repeated filings with the U.S. Securities and Exchange Commission ("SEC"); (2) maintain an SEC-registered ADR program so the shares can trade on the New York Stock

Exchange ("NYSE"); (3) register its ADSs representing interests in its Class D shares with the SEC; and (4) issue billions of dollars in debt securities to U.S. investors. Each of these activities alone—and certainly the entire course of conduct—is of far greater commercial significance than the commercial activities previously found sufficient by the Second Circuit in FSIA cases.

The Republic, as a controlling shareholder of YPF, uses its shares to direct YPF's major corporate actions. It directs substantial capital-raising activities in the United States relating to its YPF Assets, clearly demonstrating commercial use of such shares within the United States. Moreover, YPF as an entity has subsidiaries that are or have been owned by the United States. The Court should grant Plaintiff's motion and order turnover of the Republic's Class A and Class D shares of YPF, including any Republic YPF Assets currently held by BNYM representing ADR receipts or ADSs relating to such shares.

The Court should also protect Bainbridge's security by enjoining the Republic from changing the powers of any class of shares of YPF.

## FACTUAL BACKGROUND

### I. The Republic's IPO of Its YPF Assets

In the early 1990s, the Republic decided to privatize YPF through a worldwide IPO of its shares. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic ("Petersen II")*, 2023 WL 2746022, at *2 (S.D.N.Y. Mar. 31, 2023). The Republic first transformed YPF into a corporation *(sociedad anónima)* and then amended YPF's Bylaws by voting its shares at a YPF shareholder meeting. *See id.* Following these changes, the Republic specifically targeted its IPO at U.S. investors. *See* Expert Report of Nancy C. Lissemore ("Lissemore 2"), ¶¶ 21-22 (Costantini Declaration, Ex. 2), ; Fourth Expert Report of John C. Coffee, Jr. ("Coffee 4"), ¶¶ 7-10 (Costantini Declaration, Ex. 4),. The Republic sponsored an ADR program for YPF's Class D shares with BNYM as the depositary bank, and it registered both YPF's Class D shares and its ADSs

representing interests in those shares with the SEC. Lissemore 2, ¶¶ 23-25 (Costantini Declaration, Ex. 2). The Republic could offer YPF Assets to U.S. investors on the NYSE only with an SEC-registered ADR program. *Id.* ¶ 22.

The Republic's decision to target the U.S. ADR market provided foreign issuers with "increased access to U.S. investors, which may increase share liquidity and help stabilize the price for existing shares, as well as facilitate future capital increases." Guide to Public ADR Offerings in the United States, at 35 (Costantini Declaration, Ex. 3); *see also* Lissemore 2, ¶ 16 (Costantini Declaration, Ex. 2) . In other words, the U.S. ADR program benefitted *all* ADS shareholders and Class D shareholders because having U.S. trading improved liquidity and benefitted the share price.

A foreign issuer must engage repeatedly with U.S. securities markets and regulators when making an IPO in the United States. *See* Lissemore 2, ¶¶ 11-13 (Costantini Declaration, Ex. 2) . The issuer often establishes (as YPF did here) a "Level 3" ADR program to make a public offering of shares in the United States listed on a U.S. exchange, which includes required registrations and disclosures under both the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act"). *See id.* ¶¶ 14, 21.

In May and June 1993, the Republic and YPF registered YPF's Class D shares and corresponding ADSs under both the 1933 Act and the 1934 Act. *Id.* ¶¶ 21-25. The registration of the Class D shares and ADSs ensured that <u>any</u> holder of a Class D share could exchange that share for an ADS, and that YPF could issue additional ADSs as the need arose. *See id.* ¶ 18.

ADRs represent negotiable securities issued by a U.S. Depository Bank that evidence ownership interest in ADSs, which can be quoted and traded in U.S. dollars and are subject to the trading and settlement procedures of the market in which they trade. *Id.* ¶¶ 9-10. Through YPF's ADR program,

the Republic could offer its ownership of Class D shares and its ADSs representing interests in those shares to raise investment capital through sale of the ADRs.

The Republic "raised billions of dollars in investment capital" through the ADR program, with "the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE." *Petersen I*, 895 F.3d at 200. The Republic continues to raise substantial amounts through ADRs being quoted and traded in the United States. As recently as 2022, BNYM made payments totaling $2,312,416.00 to YPF for ADR program-related expenses. *See* Lissemore 2, ¶ 28 (Costantini Declaration, Ex. 2).

## II. The Republic's Control Over YPF's Capital-Raising Activities Since April 2012

On April 16, 2012, the Republic issued Decree 530/2012 expropriating 51% of YPF's Class D shares from Repsol. *Petersen II*, 2023 WL 2746022, at *3. The Court has found that the Republic "exercised indirect control over Repsol's shares on April 16, 2012," *Petersen Energía Inversora, S.A.U. v. Argentine Republic ("Petersen III")*, 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023).

On May 3, 2012, the Argentine Legislature enacted Law 26,741 (the "YPF Expropriation Law"), which became effective on May 7, 2012, *id.* at *3. To this day, the law provides that YPF (and an affiliate) "shall continue to operate as publicly traded corporations." Peterson YPF, ECF No. 363-72 (YPF Expropriation Law), Art. 15.

Since the renationalization in April 2012, the Republic has controlled YPF's major business and financial decisions through its majority shareholding in the company. As disclosed in YPF's Form 20-F for the year ended December 31, 2013:

> The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations.

YPF Form 20-F for 2013, at 10 (Costantini Declaration, Ex. 5). YPF's Form 20-F for 2013 also explains that "[t]he Argentine federal government will control the Company according to domestic energy policies in accordance with Law 26,741 (the 'Expropriation Law')." *Id.*

As controlling shareholder, the Argentine government appoints a majority of the members of YPF's Board of Directors and its senior management.[3] On February 6, 2024, YPF's new management, under the new government, announced a plan to quadruple the company's market value in the next four years.[4]

Control over YPF's capital-raising activities is not limited to its control over the Class D shares. The Republic owns 100% of the 3,764 Class A shares of YPF. Form 20-F for 2023, at 90 (Costantini Declaration, Ex. 1). As the sole holder of Class A shares for YPF, the Republic's approval is required to undertake certain strategic transactions, including decisions involving mergers and acquisitions. *Id*. at 15. Historically, certain of the Class A shares were purchased and converted to Class D shares for the very commercial activity discussed herein. *Id*. at 17. The Class A shares are entitled to elect one director member and one alternate member of the Supervisory Committee of YPF (comprised of three to five members and three to five alternate members total) so long as one share of such class remains outstanding. *Id*. at 94. Class A shares hold liquidating, voting, veto, and other rights critical to directing the commercial activity of YPF, including involving the ADR and other programs connected to the American marketplace. *Id*. at 108. Thus,

---

[3] At YPF's shareholder meeting held on April 28, 2023, the Republic used its YPF shares to appoint all 12 members of YPF's Board of Directors. *See* Coffee 4 (Costantini Declaration, Ex. 4) ¶¶ 24-25; Minutes of YPF's April 28, 2023 Shareholder Meeting, at 23-25 (Costantini Declaration,, Ex. 6).

[4] Candelaria Grimberg, *Argentina's YPF seeks to multiply value on Vaca Muerta output surge*, Reuters (Feb. 6, 2024) (Costantini Declaration,, Ex. 8).

the Republic's holding of 100% of the Class A shares of YPF furthers their ability to engage in such capital-raising activities.

YPF continues to tap the debt capital markets in the United States. *See* Coffee 4, ¶¶ 12-18, (Costantini Declaration, Ex. 4). On January 5, 2024, for example, YPF launched a successful global offering of $800 million in bonds. Coffee 4, ¶¶ 12-13 (Costantini Declaration, Ex. 4) ; Cleary Gottlieb Press Release (Costantini Declaration, Ex. 9). YPF sold $220.5 million of these bonds to U.S. institutional investors under SEC Rule 144A. Coffee 4, ¶ 13 (Costantini Declaration, Ex. 4); Luxembourg Stock Exchange Website (Costantini Declaration, Ex. 10).

## ARGUMENT

### I. The YPF Assets Are Not Immune from Execution Under the FSIA

Section 1610(a) of the FSIA provides that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune" from attachment or execution when "the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with terms of the waiver." 28 U.S.C. § 1610(a)(1). To be amenable to execution under this section, property of a foreign state must satisfy three requirements: (1) it must be "in the United States"; (2) it must be "used for a commercial activity in the United States"; and (3) the foreign state must have "waived its immunity from attachment." As explained below, the YPF Assets satisfy the second and third of these requirements, and the first requirement will be fully satisfied if the Court exercises its authority under New York law to order the Republic to transfer the shares to an account in New York for turnover to Plaintiff.

#### A. The Republic Has Waived Immunity of the YPF Assets from Attachment

As set out in the Turnover Order and the extensive history of pleadings and briefing on this matter, the underlying Form of Securities Agreement and Specimen Note executed by the Republic and governing the bonds at issue in this case include specific waivers relating to judgment, attachment, and execution. *See* ECF No. 95 (Turnover Order) at 2–4.

Consistent with the Form of Securities Agreement, the Specimen Note for the US040114GG96 Bond at issue in the matter includes an agreement from the Republic that:

> [t]o the extent that the Republic or any of its revenues, assets or properties shall be entitled . . . to any immunity from suit . . . from execution of a judgment or from any other legal or judicial process or remedy . . . the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction and consents generally for the purposes of the [FSIA] to the giving of any relief . . . in connection with any . . . Related Judgment, provided that attachment prior to judgment or attachment in aid of execution shall not be ordered by the Republic's courts with respect to (i) the assets which constitute freely available reserves pursuant to Article 6 of the Convertibility Law . . . .

ECF No. 61-1 (Specimen Note) at 12.

Section 1610(a) of the FSIA provides that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune" from attachment or execution when "the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with terms of the waiver." 28 U.S.C. § 1610(a)(1). Such waivers of immunity from attachment have been agreed to by the Republic in this case and are applicable to the YPF Assets.

### B. It is Within the Court's Power to Transfer the YPF Assets to the United States

As noted previously, some of the YPF Assets are here in the United States. However, the majority are held in Argentina. As the Court held in the Turnover Order, it has the power to order

the assets brought to the United States, if the assets are otherwise immune. *See* ECF No. 95 (Turnover Order) at 9.

### C. The YPF Assets Are Not Immune from Execution by Virtue of Being in Argentina

In the present case, this Court correctly found that a foreign state's property is not immune from execution under the FSIA "by virtue of being outside the United States." ECF No. 95 (Turnover Order) at 7. The Court concluded that the FSIA "does not supersede CPLR 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay Bainbridge." *Id; see also Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 92 (2d Cir. 2017), *vacated on other grounds sub nom. Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813 (2020). If the Court orders the Republic to deliver the YPF Assets to the United States by transferring them to a global custody account in New York, as it has the clear authority to do (see Part II.A below), those shares would qualify as property of the Republic "in the United States" under Section 1610(a).

In its Turnover Order, the Court further determined that the "prudent" course was "to evaluate whether the assets are [otherwise] subject to execution immunity <u>before</u> ordering that they be brought to the United States." ECF No. 95 (Turnover Order) at 10–11. (emphasis added). Under this procedural framework, the Court may exercise its authority under New York law to order the Republic to bring the YPF Assets into the United States if the shares would not be immune from execution afterward. Thus, this motion turns on the remaining element of § 1610(a)(1): whether the shares are "used for a commercial activity in the United States," *see* Part I.D.

### D. The Republic Uses Its Majority YPF Assets for a Commercial Activity in the United States

The Republic has been YPF's controlling shareholder for over a decade. During that time, it repeatedly and "actively . . . utilize[d]" its majority shareholding "in service of [YPF's] commercial activity" in the United States. *Export-Import Bank of the Republic of China v. Grenada ("Ex-Im Bank")*, 768 F.3d 75, 90 (2d Cir. 2014) (internal citations omitted). Among many examples, the Republic has caused YPF to: (1) solicit U.S. investment in its Class D shares via repeated SEC filings; (2) maintain an SEC-registered ADR program with BNYM so YPF shares can trade on the NYSE; and (3) issue billions of dollars in debt securities to U.S. investors. The Republic has used its majority shares for these commercial activities by appointing a majority of YPF's Board of Directors, directing the activities of that board as controlling shareholder, approving YPF's debt issuances, and directly appointing YPF's CEO. In these ways, the Republic has "put into service, availed or employed" its Class D shares of YPF "in service of" YPF's substantial commercial activity in the United States. *Id.* at 90.

Courts repeatedly have held that foreign sovereigns "use" their majority shares for commercial activity when they exercise the powers of a controlling shareholder. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex II")*, 932 F.3d 126, 151 (3d Cir. 2019); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990).

When a foreign sovereign uses its controlling shares to direct a company's commercial activity <u>in the United States</u>, the sovereign's shares are "used for" commercial activity in this country, satisfying the requirement of Section 1610(a). *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex I")*, 333 F. Supp. 3d 380, 417-420 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019); *see also In re 650 Fifth Ave. Co.*, No. 08 Civ. 10934, 2014 WL 1284494 at *17 (S.D.N.Y. Mar. 28, 2014).

Here, the Republic plainly "uses" its controlling Class D shares and Class A shares to direct YPF's major corporate actions, including in the United States. Each year, YPF advises U.S. investors that the Republic exercises a high degree of control over YPF. *See*, *e.g.*, YPF 20-F for 2013, at 10 (Costantini Declaration, Ex. 5).[5] The Republic exercises control in numerous ways, including through its election of the majority of the members of YPF's Board of Directors, who have organized and conducted YPF's ADR program with BNMY, the listing of its Class D shares on the NYSE, and the registration of the shares with the SEC. *See id.*

In addition, YPF's Bylaws prescribe that many corporate actions, including international debt issuances and the delisting of its shares from the NYSE, require approval from the Republic as controlling shareholder. *See* Peterson YPF, ECF No. 45-2 (YPF Bylaws), §§ 17(vi), 24. Further, under Argentine law, the Republic must manage "the shareholder rights corresponding to the shares" to procure "[t]he administration" and "management of YPF" in conformity with various principles, including "safeguarding shareholder interest and generating value on their behalf." Peterson YPF, ECF No. 363-72 (YPF Expropriation Law), Art. 16. The Republic thus has a legal mandate to use its majority shares to direct YPF's major business activities, protect the interests of YPF's shareholders, and create value for them.

The Republic has carried out this legal mandate by directing YPF to tap the equity and debt capital markets in the United States. Section 17 of the YPF Bylaws grants YPF's Board of Directors wide powers to "organize, conduct and manage" capital-raising activities, including (i) the issuance of debt "within the country or abroad" and (ii) the listing of YPF's shares on "domestic and foreign stock and security markets." Peterson YPF, ECF No. 363-1 (YPF Bylaws) at 21-24.[6]

---

[5] *See also* YPF 20-F for 2023, at 6, 104 (Costantini Declaration, Ex. 1).

[6] Note that, in addition to tapping the equity and debt market in the United States, YPF as an entity also has or has had several connections to the United States, including by way of its

Since April 2012, YPF has sold more than $2.4 billion in debt just to U.S. investors under these global programs. Coffee 4, ¶ 14 (Costantini Declaration, Ex. 4) . The Republic also has an obvious (and recent) incentive to continue to direct this commercial activity in the United States.[7]

Finally, there can be no serious dispute that YPF's capital-raising activities qualify as "commercial activity" under the FSIA. *See, e.g.*, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 615-17 (1992); *EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010). Moreover, this commercial activity is "in the United States," because it has "substantial contact with the United States." 28 U.S.C. § 1603(e); *see*, *e.g.*, *Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2d Cir. 1991). Far from the mere receipt of financing or transferring promissory notes through a U.S. intermediary, YPF purposefully targets the U.S. equity and debt capital markets.

## II. The Court Should Order the Turnover of the YPF Assets to Plaintiff

CPLR § 5225 is New York's turnover statute.[8] Paragraphs (a) and (b) of § 5225 authorize a New York court to issue a turnover order directed to the judgment-debtor or a garnishee in custody of the judgment-debtor's property. CPLR § 5225(c) provides that "[t]he court may order any person to execute and deliver any document necessary to effect payment or delivery."

---

subsidiary YPF Holdings, which was owned 100% by the United States, until its dissolution on December 28, 2023. Form 20-F for 2023, at 26, 48 (Costantini Declaration, Ex. 1).

[7] For example, in November 2023, then President-elect Javier Milei named Horacio Marín as YPF's CEO, instructing him to increase YPF's share price in the run-up to the Argentine government's possible sale of its YPF shares, demonstrating the vital nature of the ADR program. Charles Newberry, *Argentina president-elect picks Horacio Marín to run YPF in run-up to selling state shares*, S&P Global Insights (Nov. 24, 2023) (Costantini Declaration, Ex. 7).

[8] Under Federal Rule of Civil Procedure 69(a)(1), "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located."

It is well-settled that a New York court can order a judgment-debtor or garnishee to turn over the judgment-debtor's extraterritorial property, including shares in a foreign corporation. *See, e.g.*, *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 541 (2009) (holding that New York court could order garnishee bank to turn over stock certificates located in Bermuda and representing shares in Bermuda corporation); *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 41 A.D.3d 25, 35, 39 (N.Y. App. Div. 1st Dep't 2007); *Inter-Reg'l Fin. Grp., Inc. v. Hashemi*, 562 F.2d 152, 154-55 (2d Cir. 1977).[9]

Section 7(a) of YPF's Bylaws provides that its shares "shall be book-entry shares" and "shall not be represented by certificates." Peterson YPF, ECF No. 45-2 at 4. The register of YPF's book-entry shares is kept by Caja de Valores, the Republic's central securities depository and (like the U.S.'s DTC) a member of the global network of securities depositories. *See* YPF Form 20-F for 2023, at 92 (Costantini Declaration, Ex. 1); 2022-2023 Depository Information Gathering Project: A Report for Clients and Participating Depositories, at App. C (Costantini Declaration, Ex. 11). The YPF Assets "are held in Argentina at the Caja de Valores." Peterson YPF, ECF No. 539-1 at 4-5. The Republic holds the shares at Caja de Valores directly, rather than in "street name" through a broker or other intermediary.[10]

[9] New York courts have the power to require a wide variety of actions by judgment-debtors. *See, e.g.*, *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 265 (2d Cir. 2012); *Gryphon*, 41 A.D.3d at 36.

[10] Most shareholders of Argentine companies hold their shares in "street name," indirectly through a broker or other intermediary that has a participant account at Caja de Valores. *See* World Forum of CSDs, WFC Single Disclosure Report 2020, at 72 (Costantini Declaration, Ex. 12).

As explained below, New York law authorizes the Court to order the Republic to transfer its ownership interests in its YPF Assets to Plaintiff through a global custody account in New York, and the fact that the shares may exist only in book-entry form in Argentina is of no moment.

### A. New York Law Entitles Plaintiff to the Court's Assistance in Reaching the YPF Assets

CPLR § 5201(c)(4) provides that New York UCC § 8-112 "shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process." The YPF Assets qualify as "uncertificated securit[ies]" under the UCC because they exist only in book-entry form.[11]

As a general matter, a creditor can reach the interest of a debtor in an uncertificated security "only by legal process upon the issuer at its chief executive office in the United States." UCC § 8-112(b). But where the debtor's interest in a security "cannot readily be reached by other legal process," UCC § 8-112(e) provides that the creditor is "entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement." As the Second Circuit held in construing UCC § 8-317(2) (the predecessor of § 8-112(e)), a court is "authorize[d] . . . to issue an injunction in aid of the attachment which may take the form of a mandate requiring the defendant to bring the certificates into the state . . . and to deliver them into the actual physical control and possession of the sheriff." *Inter-Reg'l Fin. Grp.*, 562 F.2d at 154-55 & n.2. UCC § 8-112(e) entitles Plaintiff to this Court's

[11] New York UCC § 8-102(18) defines "uncertificated security" as "a security that is not represented by a certificate." The term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a broker or other securities intermediary. *See* NY UCC § 8-102(7), (17). The Republic Assets are not "security entitlement[s]" because they are registered to the Republic and not held in "street name." *See* NY UCC § 8-501(d).

assistance, "by injunction or otherwise," in reaching the YPF Assets, because the shares "cannot readily be reached by other legal process."

### B. The Court Should Order the Republic to Transfer Its Ownership Interests in Its YPF Assets to Plaintiff Through a Global Custody Account at BNYM in New York

Plaintiff respectfully requests that the Court exercise its authority under CPLR § 5225(c) and UCC § 8-112(e) to issue an order requiring the Republic to take the following two steps: (i) transfer forthwith its YPF Assets to a global custody account at BNYM in New York for turnover to Plaintiff; and (ii) instruct BNYM to transfer the Republic's ownership interests in the YPF Assets to Plaintiff or its designees. As explained below, the Republic's compliance with the first part of this order would satisfy the requirement under Section 1610(a) of the FSIA that the property in question be "in the United States."

A global custody account allows an investor to hold all of its domestic and foreign securities through a single global custodian. *See* The Clearing House: The Custody Services of Banks, at page iii-iv (Costantini Declaration, Ex. 13). The global custodian maintains a network of local sub- custodians in foreign markets, and each sub-custodian in turn is a member of the central securities depositary in its own market. *Id.* at pages ii-iii. In this way, the New York branch of a global custodian can maintain an account that indirectly holds foreign securities on behalf of an investor, including when those securities are uncertificated and exist in book-entry form.

The New York office of BNYM provides global custody services to investors, and through a sub-custodian in Argentina it can hold the book-entry securities of Argentine corporations on behalf of those investors. *See* BNYM List of Sub-Custodians (Costantini Declaration, Ex. 14). BNYM also has historically had contractual relationships with both the Republic (for which it serves as trustee and paying agent on sovereign debt issuances) and YPF (for which it maintains the ADR program and serves as depositary).

Upon compliance by the Republic with this Court's order that it transfer its YPF Assets to a global custody account at BNYM in New York, its ownership interests in the shares will qualify as "security entitlement[s]" under the UCC. *See* NY UCC § 8-102(7), (17); NY UCC § 8-112, Official Cmts., ¶ 3. Moreover, the Republic's security entitlements will have a New York situs, because the account will be held at the New York office of BNYM. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Herman*, 168 A.3d 514, 521-22 (Conn. App. Ct. 2017) (judgment-debtor's security entitlement had Connecticut situs under UCC § 8-112 because its account was with Connecticut office of brokerage firm, even though securities certificates were held by securities depositary in New York).

The second part of this Court's order will require the Republic to instruct BNYM to transfer the Republic's ownership interests in its YPF Assets to Plaintiff or its designees. *See Gryphon*, 41 A.D.3d at 39 (ordering judgment-debtor under CPLR § 5225(c) to "execute appropriate documents" to transfer shares in foreign corporations to plaintiffs).

## III. The Court Should Issue an Injunction Enjoining the Republic from Undercutting Bainbridge's Rights with Respect to the YPF Assets

Plaintiff respectfully requests that the Court exercise its authority under Federal Rule of Civil Procedure Rule 65 to protect Bainbridge's security by enjoining the Republic from changing the powers of any class of shares of YPF to appoint directors of YPF and from changing the powers of YPF directors as currently constituted. In order to be entitled to an injunction, Bainbridge must show three things: (1) that Bainbridge will suffer irreparable harm without the injunction; (2) that Bainbridge is likely to succeed on the merits; and (3) that the balance of hardships tips in Bainbridge's favor. See, e.g., *Jayaraj v. Scappini*, 66 F.3d 36, 38 (2d Cir. 1995); see also, e.g., *Time Warner Cable v. Bloomberg, L.P.*, 118 F.3d 917, 923 (2d Cir. 1997).

Bainbridge will suffer irreparable harm without the injunction. As set out herein, the Republic, as YPF's controlling shareholder, holds controlling rights, including liquidation, voting, and veto rights. The Republic thus has the ability to dispose of or significantly alter control over the YPF Assets overnight. Should YPF be ordered by the Court to turn over the YPF Assets, Bainbridge faces an immediate threat of irreparable harm that the Republic will use its authority as controlling shareholder of YPF to diminish the value of the YPF Assets. If the Republic changes the powers of any class of shares of YPF to appoint directors of YPF or the powers of YPF directors as currently constituted, Bainbridge runs the risk of the YPF Assets being stripped of value and the Republic once again evading enforcement of the Judgment and the Turnover Order.

For the reasons set out herein, Bainbridge is likely to succeed on the merits on this matter. Bainbridge has set out its entitlement to relief through this motion and the accompanying supporting documents and pleadings. Moreover, the first to parts of the Court's order will establish that Bainbridge has made such a showing.

The balance of hardships relating to the injunction weigh in Bainbridge's favor. The Republic is being enjoined from taking action it has not yet established any intention to take. Abstaining from making material changes to the organizational structure of YPF will have no impact on YPF, financial or otherwise, that is of the same or more significance than the risk Bainbridge runs of the Republic devaluing its assets to evade enforcement of the Court's judgment.

For the foregoing reasons, Bainbridge requests that the Court include the following injunction in its Order: the Republic shall be enjoined from taking, and from causing or permitting YPF, or any director of YPF, or any other person or entity to so take, any action that is intended to, or would have the effect of, (i) amending in any way, the rights of any class of YPF shares, including but not limited to, the right of the holder(s) of shares of any such class to elect one or

more directors, (ii) amending the voting or other rights or powers with respect to any directors of YPF (including by way of changing the number of directors constituting such board), including the rights of any such director to serve on any committee, or (iii) amending the rights of any class of YPF shares with respect to dividends or receiving assets of YPF upon its dissolution.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court issue an order requiring the Republic to take the following three steps: (i) transfer its YPF Assets to a global custody account at BNYM in New York within 14 days from the date of the Court's order; (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its YPF Assets to Plaintiff or its designees within one business day of the date on which the shares are deposited into the account; and (iii) protect Bainbridge's security by enjoining the Republic from changing the powers of any class of shares of YPF..

Dated: New York, New York

May 3, 2024

Respectfully submitted,

DUANE MORRIS LLP

/s/ Anthony J. Costantini
Anthony J. Costantini
Email: ajcostantini@duanemorris.com
1540 Broadway
New York, NY 10036-4086
Telephone: +1 212 692-1000
Fax: +1 212 692 1020

*Counsel for Plaintiff Bainbridge Fund Ltd.*