**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BAINBRIDGE FUND LTD.,

               Plaintiff,

    -against-

THE REPUBLIC OF ARGENTINA,

               Defendant.

Civil Case No. 1:16-cv-08605-LAP

**THE REPUBLIC OF ARGENTINA'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR TURNOVER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................ 2

    A.    Plaintiff Bainbridge ............................................................................. 2

    B.    The Current Motion ............................................................................. 3

ARGUMENT ................................................................................................................. 7

I.     BAINBRIDGE HAS NOT IDENTIFIED TRANSFERRABLE
     PROPERTY THAT IS SUBJECT TO TURNOVER ....................................... 7

II.    FOREIGN-SOVEREIGN PROPERTY LOCATED OUTSIDE
     THE UNITED STATES IS IMMUNE FROM TURNOVER ......................... 9

    A.    Federal Common Law Immunizes All Foreign-Sovereign
        Property Located Outside the United States, Which Is
        Unchanged By The FSIA ...................................................................... 9

    B.    The FSIA Independently Precludes Bainbridge's Turnover
        Request ............................................................................................... 14

        1.    Section 1610(a)'s Requirement Of Property "In The
            United States" Is Not Satisfied ............................................... 15

        2.    The Republic's Ownership Interests In BNA And
            Aerolíneas Are Not "Used For A Commercial
            Activity In The United States." .............................................. 16

    C.    New York Law Does Not Authorize Forced Transfer Of
        Foreign-Sovereign Property Located Abroad ..................................... 19

    D.    Bainbridge's Proposed Creation Of A New "Securities
        Entitlement" Raises Additional Problems Under New York
        Law ..................................................................................................... 22

III.   BAINBRIDGE'S TURNOVER REQUEST VIOLATES
     INTERNATIONAL COMITY AND THE ACT-OF-STATE
     DOCTRINE ......................................................................................... 24

    A.    Bainbridge's Request For Turnover Directly Conflicts With
        Argentine Law ................................................................................... 24

B.    Turnover Would Violate The Act-Of-State Doctrine ........................................ 26

CONCLUSION ................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*,
190 F.3d 16 (2d Cir. 1999)..................................................................................7–8

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
584 F.3d 120 (2d Cir. 2009)..........................................................................10, 15, 18

*Autotech Techs. LP v. Integral Rsch. & Dev. Corp.*,
499 F.3d 737 (7th Cir. 2007) ..........................................................................10, 12

*Bainbridge Fund LTD v. Republic of Argentina*,
690 F. Supp. 3d 411 (S.D.N.Y. 2023)......................................................................22

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*,
999 F.3d 808 (2d Cir. 2021)......................................................................................15

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
581 U.S. 170 (2017)..................................................................................................25

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)..................................................................................................20

*Braka v. Bancomer, S.N.C.*,
762 F.2d 222 (2d Cir. 1985)......................................................................................27

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ...............................................................................26–27

*Clearstream Banking S.A. v. Peterson*,
140 S. Ct. 813 (2020).........................................................................................12–13

*Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com.*,
21 N.Y.3d 55 (2013) .................................................................................................23

*Conn. Bank of Com. v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002) ...............................................................10, 11–12, 15–16

*Credit Suisse v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*,
130 F.3d 1342 (9th Cir. 1997) .................................................................................27

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    932 F.3d 126 (3d Cir. 2019)..................................................................................................19

*De Letelier v. Republic of Chile*,
    748 F.2d 790 (2d Cir. 1984)..................................................................................................12

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012)..................................................................................................10

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
    768 F.3d 75 (2d Cir. 2014)..............................................................................................14, 16

*Ezrasons, Inc. v. Rudd*,
    — N.E.3d —, 2025 WL 1436000 (N.Y. May 20, 2025) .....................................................20

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)........................................................................................................21, 22

*Fed. Republic of Germany v. Philipp*,
    592 U.S. 169 (2021)..............................................................................................................22

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983).........................................................................................................17–18

*Flatow v. Islamic Republic of Iran*,
    76 F. Supp. 2d 16 (D.D.C. 1999) .........................................................................................18

*Foremost- McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) .............................................................................................19

*Goldberg & Connolly v. Xavier Const. Co.*,
    94 A.D.3d 1117 (2012) .........................................................................................................23

*Gregory v. Stetson*,
    133 U.S. 579 (1890).........................................................................................................22–23

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014)............................................................................................24–25

*Hartford Fire Ins. Co. v. California*,
    509 U.S. 764 (1993).........................................................................................................21–22

*Havens v. James*,
    76 F.4th 103 (2d Cir. 2023) .................................................................................................22

*In re Austrian, German Holocaust Litig.*,
   250 F.3d 156 (2d Cir. 2001)..................................................................................26

*Ings v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960)..................................................................................24

*JPMorgan Chase Bank, N.A. v. Motorola, Inc.*,
   47 A.D.3d 293 (1st Dep't 2007) ..............................................................................7

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
   830 F.3d 107 (2d Cir. 2016)..................................................................................19

*Levin v. Bank of N.Y.*,
   No. 09-cv-5900, 2022 WL 523901 (S.D.N.Y. Feb. 21, 2022) ........................10, 14

*Liu v. U.S. Cong.*,
   834 Fed. App'x. 600 (2d Cir. 2020)......................................................................26

*Minerva Surgical, Inc. v. Hologic, Inc.*,
   594 U.S. 559 (2021)..........................................................................................10–11

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)..............................................................................................11

*Motorola Credit Corp. v. Standard Chartered Bank*,
   21 N.E.3d 223 (N.Y. 2014)...................................................................................20

*Motorola Credit Corp. v. Uzan*,
   388 F.3d 39 (2d Cir. 2004)...........................................................................24, 25–26

*Murray v. Schooner Charming Betsy*,
   6 U.S. 64 (1804)....................................................................................................11

*New York & Cuba Mail S. S. Co. v. Republic of Korea*,
   132 F. Supp. 684 (S.D.N.Y. 1955) .........................................................................9

*Perkins v. Lukens Steel Co.*,
   310 U.S. 113 (1940)..........................................................................................22–23

*Peterson v. Islamic Republic of Iran*,
   627 F.3d 1117 (9th Cir. 2010) .........................................................................10, 15

*Peterson v. Islamic Republic of Iran*,
   876 F.3d 63 (2d Cir. 2017).........................................................................12, 13, 25

*Peterson v. Islamic Republic of Iran*,
  963 F.3d 192 (2d Cir. 2020)...................................................................................13

*Reebok Int'l Ltd. v. McLaughlin*,
  49 F.3d 1387 (9th Cir. 1995) ...............................................................................24

*Republic of Argentina v. NML Capital, Ltd.*,
  573 U.S. 134 (2014)....................................................................................13, 25

*Republic of Mexico v. Hoffman*,
  324 U.S. 30 (1945)...............................................................................................25

*Republic of Philippines v. Westinghouse Elec. Corp.*,
  43 F.3d 65 (3d Cir. 1994)....................................................................................26

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992) ............................................................................10

*Rothbard v. Jenkins*,
  197 N.Y.S.2d 784 (Sup. Ct. 1959).....................................................................23

*Seijas v. Republic of Argentina*,
  502 F. App'x 19 (2d Cir. 2012) .......................................................................4, 18

*Seijas v. Republic of Argentina*,
  No. 04 Civ. 400 (TPG), 2009 WL 10700009 (S.D.N.Y. Aug. 19, 2009) ................18

*Stephens v. Nat'l Distillers & Chem. Corp.*,
  69 F.3d 1226 (2d Cir. 1995)...............................................................................11

*Trade Dev. Bank v. Cont'l Ins. Co.*,
  469 F.2d 35 (2d Cir. 1972)..................................................................................26

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025).............................................................................................22

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264 (2023)......................................................................................11, 13

*United States v. Texas*,
  507 U.S. 529 (1993).............................................................................................11

*United States v. Wells Fargo Bank*,
  485 U.S. 351 (1988).............................................................................................10

*W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l,*
    493 U.S. 400 (1990)................................................................................26, 27

*Walters v. Indus. & Com. Bank of China, Ltd.,*
    651 F.3d 280 (2d Cir. 2011)...........................................................9, 10, 16–17

*Weilamann v. Chase Manhattan Bank,*
    192 N.Y.S.2d 469 (N.Y. Sup. Ct. 1959)..................................................20

**Rules and Statutes**

28 U.S.C. § 1605(a)(2)................................................................................16

28 U.S.C. § 1609................................................................................9, 12, 15

28 U.S.C. § 1610.................................................................. *passim*

N.Y. C.P.L.R. § 105................................................................................24

N.Y. C.P.L.R. § 5201................................................................................7, 24

N.Y. C.P.L.R. § 5225.................................................................. *passim*

N.Y. U.C.C. § 8-112................................................................................24

Restatement (Third) of Foreign Relations Law § 403 ................................21

Restatement (Fourth) of Foreign Relations Law § 432(b) (2018) ................21

17 C.F.R. § 230.144A................................................................................17

**Other Authorities**

*About Aerolíneas Argentinas,* https://perma.cc/DB2N-LGXD (last visited November 26, 2025) ................................................................................5

*Banco Nación in the world,* https://perma.cc/2BXQ-4KF5 (last visited November 26, 2025) ................................................................................3

H.R. Rep. No. 94-1487 (1976)................................................................................10

## PRELIMINARY STATEMENT

This Court previously granted Bainbridge Fund Ltd. ("Bainbridge")'s motion for turnover of the Republic of Argentina (the "Republic")'s shareholding of Argentina's largest energy company, YPF S.A. ("YPF") (the "YPF Turnover Order"). The YPF Turnover Order is now on appeal in the Second Circuit, which has stayed the Order pending that appeal. Bainbridge nevertheless brings this motion seeking turnover of the Republic's ownership interests in other entities—Banco de la Nación Argentina ("BNA") and Aerolíneas Argentinas, S.A ("Aerolíneas")—based on the same legal theories under review in the YPF Turnover Order appeal.

The instant motion fails at the gate based on the nature of BNA and Aerolíneas and also fails for the same reasons at issue in the appeal of the YPF Turnover Order.

*First*, Bainbridge's turnover request fails as to BNA because there are no shares in BNA, and therefore, there are no BNA shares owned by the Republic to turn over in the first place. The motion also fails as to Aerolíneas because under Argentine law, the Republic's shares in Aerolíneas can only be held by the Republic, its branches, or its agencies, and cannot be transferred to or held by foreign private parties such as Bainbridge. The motion can and should be denied in full on these grounds, which are independent of those at issue in the YPF Turnover Order appeal.

*Second*, turnover here also fails on the same grounds at issue in the YPF Turnover Order appeal: It would violate longstanding federal common law barring the execution on foreign-sovereign property located outside of the United States; the FSIA's requirements for abrogation of sovereign immunity from execution are not satisfied; New York law does not permit the turnover of foreign sovereign property located outside the United States; and principles of international comity and the act-of-state doctrine prevent turnover that would nullify Argentine law and require the Republic to violate its own laws. This Court has recognized that "the Court of Appeals'

decision on the appeal of the YPF Turnover Order may 'undoubtedly affect Bainbridge's proposed motion for turnover.'" Dkt. No. 211. Accordingly, if the Court reaches these arguments, the Republic respectfully requests that the Court refrain from ruling on this motion until the YPF Turnover Order appeal is decided, so the parties can brief how that decision affects this motion.

## BACKGROUND

### A.    Plaintiff Bainbridge

Bainbridge is an offshore Bahamas entity that holds defaulted Republic bonds issued pursuant to a 1994 Fiscal Agency Agreement. *See* Fiscal Agency Agreement (Decl. of Carmine D. Boccuzzi, Jr., dated November 26, 2025 ("Boccuzzi Decl."), Ex. A). Unlike the vast majority of the Republic's bondholder creditors, Bainbridge chose not to participate in the Republic's 2005 or 2010 debt exchange offers or its historic 2016 settlement, through which the Republic resolved essentially all outstanding defaulted debt claims against it. *See* 2024 18-K at D-13 (Declaration of Anthony J. Costantini, dated October 17, 2025, Dkt. No. 214 ("Costantini Decl."), Decl. Ex. 2). Instead, beginning in 2016, Bainbridge chose to litigate for years meritless claims barred by the statute of limitations, obtaining a judgment for $95,424,899.38 on its non-time barred claims in December 2020. Dkt. No. 41. Bainbridge has filed various "me too" motions, including a motion for attachment regarding remaining collateral of the Republic's Brady bonds, which had previously been attached by Attestor Master Value Fund LP and other related plaintiffs. Dkt. No. 75. On July 14, 2025, this Court found Attestor had priority over Bainbridge to these funds, and that ruling is on appeal. Dkt. No. 198; Dkt. No. 204.

In May 2024—largely adopting a turnover motion by plaintiffs Petersen Energía Inversora, S.A.U *et al* and Eton Park Cap. Management, L.P. *et al*—Bainbridge moved for turnover of the Republic's shareholding in YPF. Dkt. No. 106, 107. That motion was granted on June 30, 2025.

Dkt. No. 189.  The Republic filed an appeal of the YPF Turnover Order on July 10, 2025, which remains pending.  Dkt. No. 194.  In the appeal, the U.S. Government and eight other sovereigns filed statements supporting the Republic's position that assets located outside of the United States are absolutely immune from execution.[1]  By order of the Second Circuit, the YPF Turnover Order is stayed pending the resolution of the appeal.  Order, *Bainbridge Fund Ltd. v. Republic of Argentina,* No. 25-1686 (2d Cir. Aug. 15, 2025), Dkt. No. 40.1.

### B.    The Current Motion

Bainbridge filed the current motion on October 17, 2025, seeking turnover of the Republic's "ownership interests in Banco de la Nación Argentina [and] Aerolíneas Argentinas." Pl. Br. at 1, Dkt. No. 213 ("Pl. Br.").  Bainbridge acknowledges the overlap between this motion and the YPF Turnover Order proceedings, stating that an order granting this motion should be stayed pending resolution of the YPF Turnover Order appeal.  *Id.* at 2 n.2.

***BNA.***  Founded in 1891, BNA's primary purpose is to provide financial assistance to micro, small and medium-sized enterprises in Argentina.  *See* Decl. of Federico Campolieti, dated November 26, 2025 ("Campolieti Decl.") ¶ 18; BNA Charter Art. 3 (Campolieti Decl. Ex. 9). BNA's operations through its branches in New York and Miami "sustain and promote the activity abroad of the Argentine export sectors . . . especially [] Small and Medium Enterprises (SMEs)." *See Banco Nación in the world*, BNA, https://perma.cc/2BXQ-4KF5.

---

[1] The U.S. Government, the Republic of Ecuador, the Republic of Chile, the Italian Republic, Romania, Ukraine, the Republic of Uruguay, the State of Israel, the French Republic, the Province of Chubut, the Bank Policy Institute, the American Bankers Association, and the American Chamber of Commerce in Argentina have filed statements in support of the Republic. *See Bainbridge Fund Ltd. v. Republic of Argentina,* No. 25-1686 (2d Cir. 2025), Dkt. Nos. 52, 56,  64–65, 67, 72; *Petersen Energía Inversora, S.A.U. et al v. Argentine Republic*, No. 25-1687, Dkt. Nos. 67–71, 78, 81, 83, 88–89, 95.

Pursuant to its charter, BNA is "an autarchic entity pertaining to the State."  BNA Charter Art. 1 (Campolieti Decl. Ex. 9).  Under Argentine law, autarkic entities have independent juridical status, provide specialized functions, and are responsible for their own actions and obligations. Campolieti Decl. ¶ 10.  BNA functions with administrative and budgetary autonomy from the Republic.  *Id.* ¶ 17.  BNA neither funds, nor is funded by, the Republic.  It generates its own working capital from the profits of its operations, maintains its own books and records, and does not commingle funds with the Republic.  *Id.* ¶ 18.  BNA may not lend to the Republic unless special guaranties are in place.  *Id.*  BNA has an independent board of directors, officers, and employees.  *Id.* ¶ 20.  BNA's Charter prohibits individuals who hold positions compensated by and reporting directly or indirectly to, the national, provincial or municipal governments, as well as members of legislative or judicial bodies, from serving as BNA directors.  *Id.* ¶ 21, BNA Charter Art. 13 (Campolieti Decl. Ex. 9).  The executive branch does not participate in BNA's day-to-day operations or its board's deliberations.  *Id.* ¶ 20.

As an autarkic entity, BNA is an "agency or instrumentality of a foreign state" under the FSIA.  *See Seijas v. Republic of Argentina*, 502 F. App'x 19, 20 (2d Cir. 2012).  But unlike the case of state-owned corporations, the Republic does not have an economic ownership interest in BNA. Campolieti Decl. ¶¶ 9, 19.  The Republic does not hold any shares in BNA because—as the Republic noted in its letter response when Bainbridge requested a pre-motion conference on this motion, Dkt. No. 209 at 2— BNA does not *have* shares.  Campolieti Decl. ¶ 19.  Nor does the Republic hold an economic ownership interest in BNA in any other form.  *Id.*

Bainbridge cites Argentine Decree No. 116/2025 ("Decree 116"), which was issued in February 2025 and contemplates conversion of BNA into a "Sociedad Anónima" or corporation.

Pl. Br. at 4-5.[2]  This decree was submitted to the Argentine Congress in March 2025, but has neither been approved nor rejected by Congress.  Campolieti Decl. ¶ 28.  Further, it has been enjoined by an Argentine court, as Bainbridge concedes.  *Id.* ¶ 32; Pl. Br. at 4.  In March 2025, that Argentine court issued a six-month injunction, suspending the effects of Decree 116.  Campolieti Decl. ¶ 32.  In September 2025, prior to the expiration of the six-month injunction issued in March 2025, the same court extended the injunction by an additional six months, *i.e.*, until March 2026.  *Id.*  Accordingly, Decree 116 has had no effect to date.  *Id.* ¶ 33; Decree 116 Art. 10 (stating BNA's existing charter remains in effect unchanged unless and until the proposed transformation of BNA into a corporation is completed) (Campolieti Decl. Ex. 11).

**Aerolíneas.**  Aerolíneas is the largest domestic airline in Argentina.  *See About Aerolíneas Argentinas*, available at https://perma.cc/DB2N-LGXD.  Headquartered in Buenos Aires, it "plays a vital role in connecting even the most remote regions of Argentina."  *Id.*; Aerolíneas Bylaws § I, Art. 3 (Campolieti Decl. Ex. 31).  Aerolíneas' mission "is to connect Argentinians and contribute to the country's social and economic integration and development."  Aerolíneas Argentinas Financial Statement as of June 20, 2023 at 2 (Boccuzzi Decl. Ex. C).  Aerolíneas is independently managed by a duly elected board of directors.  Campolieti Decl. ¶¶ 43–44.  It is separate from the Republic, and its Bylaws provide for independent means for it to raise funds.  *Id.* ¶ 48; Aerolíneas Argentinas Financial Statement as of June 20, 2023 at 16 (noting Board of Directors' 2023 approval of issuance of fiduciary securities for up to US$ 300 million to cover costs of infrastructure upgrades) (Boccuzzi Decl. Ex. C).

---

[2] As to Bainbridge's assertion that Decree 116 would convert BNA into the "functional equivalent of a U.S. corporation," Pl. Br. at 4, 12, even if BNA were converted into a "Sociedad Anónima," it would remain an Argentine-law governed entity.  *See* Campolieti Decl. ¶ 34.

Originally founded in 1950, Aerolíneas was privatized in 1990.  Campolieti Decl. ¶¶ 35–36.  In September 2008, the Argentine Congress provided for the "*rescate*" of the airline.  *See* 2024 18-K at D-51(Costantini Decl. Ex. 2); *see also* Campolieti Decl. ¶ 37; Law No. 26,412 Art. 1 (noting "the national government shall proceed with the rescue of" Aerolíneas "by purchase of its corporate shares" and authorizing such purchase "[t]o guarantee the public service of commercial air transport of passengers, mail and cargo" in Argentina) (Campolieti Decl. Ex. 27).  In December 2008, the Argentine Congress declared the shares in Aerolíneas to be of public utility and subject to expropriation pursuant to the framework set out in Argentine Law No. 21,499.  *See* 2024 18-K at D-51 (Costantini Decl. Ex. 2); Law No. 26,466 Art. 1 (Campolieti Decl. Ex. 28).  Under the valuation guidelines in Law No. 21,499, the Republic's National Valuation Board estimated that at the time of its expropriation, Aerolíneas and its affiliates had an aggregate *negative* value in the approximate range of US $602-872 million.  2024 18-K at D-51 (Costantini Decl. Ex. 2).

The Republic holds 99.99% of Aerolíneas' shares, in the form of Class A and Class C shares (the "Aerolíneas Shares").  *See* Campolieti Decl. ¶ 41; Aerolíneas Argentinas Webpage (Campolieti Decl. Ex. 29).  Aerolíneas' Bylaws provide for the Aerolíneas Shares to be held in a book-entry share register.  *Id.* ¶ 42, Aerolíneas Bylaws Art. 6 (Campolieti Decl. Ex. 31).  Aerolíneas' shares do not trade in the United States.  *Id.* ¶ 42.  The Republic votes its shares in shareholders' meetings held in Argentina.  Aerolíneas Bylaws Art. 16 (Campolieti Decl. Ex. 31).

Under Argentine law, "[e]xclusively, the National Government, or any of its branches or agencies, shall be the sole holder of Class A and Class C shares."  Aerolíneas Bylaws Art. 10 (Campolieti Decl. Ex. 31).  Class A and Class C shares cannot be transferred to any other party.  Campolieti Decl. ¶¶ 41, 50.  Class B and Class D shares are held by certain employees of Aerolíneas.  *Id.* ¶ 41.  Class B shares can only be transferred to other such employees.  *Id.*  Class

D shares can also be transferred to other such employees, and in certain limited circumstances, to third parties. *Id.*; *see also* Aerolíneas Bylaws Art. 10 (Campolieti Decl. Ex. 31). Aerolíneas' Bylaws additionally mandate that any transfer of shares must comply with the provisions of Article 99, subsection 4 of Law No. 17,285, Argentina's Aeronautical Code. Campolieti Decl. ¶ 51; Aerolíneas Bylaws Art. 10 (Campolieti Decl. Ex. 31). According to Article 99, Aerolíneas (1) must have a permanent domicile *in Argentina*; (2) the control and management of the company must be in the hands of natural persons with legal domicile *in Argentina*; and (3) the chairman of the board of directors, managers, and at least two-thirds of the directors or administrators of Aerolíneas must have a legal domicile *in Argentina*. Campolieti Decl. ¶ 51; Law No. 17,285 Art 99 (Campolieti Decl. Ex. 32).

Aerolíneas' Bylaws specify that any transfer of shares that does not comply with the Bylaws "shall be null and void and of no effect whatsoever." Campolieti Decl. ¶ 54; Aerolíneas Bylaws Art. 11 (Campolieti Decl. Ex. 31). As Bainbridge seeks turnover of the Republic's shares in Aerolíneas, and the Republic holds Class A and C shares, the turnover that Bainbridge seeks is not possible under Aerolíneas' Bylaws.

## ARGUMENT

## I.    BAINBRIDGE HAS NOT IDENTIFIED TRANSFERRABLE PROPERTY THAT IS SUBJECT TO TURNOVER

Under C.P.L.R. Section 5201(b), judgments may only be enforced against property which "could be assigned or transferred." *See JPMorgan Chase Bank, N.A. v. Motorola, Inc*., 47 A.D.3d 293, 303 (1st Dep't 2007) (property is available for enforcement under C.P.L.R. § 5201(b) only if the property "could be assigned or transferred"); *All. Bond Fund, Inc. v. Grupo Mexicano De*

*Desarrollo, S.A.*, 190 F.3d 16, 24 (2d Cir. 1999) (only property "which by law the debtor may assign or transfer" is subject to attachment) (citation modified).

Bainbridge seeks turnover of the Republic's ownership interests in BNA and Aerolíneas. Pl. Br. at 1. But the Republic does not have an ownership interest in BNA, in the form of shares or in any other form. Campolieti Decl. ¶ 19. BNA, as an autarkic entity, "is not an asset subject to ownership by the State." *Id*. It is part of Argentina's national public sector but it is not "'state-owned' in an economic sense." *Id.* ¶ 10 ("References to [autarkic entities such as BNA] being 'state-owned' are references to the fact that they are part of the national administration."). Additionally, the Republic does not own shares in BNA S.A., which is not in existence as the effects of Decree 116 have been suspended by court orders. *Id.* ¶ 29. Accordingly, the Republic does not have an economic property interest in BNA so there is nothing to turn over.

As to Aerolíneas, Bainbridge concedes that the Aerolíneas Shares are "*non-transferable* ordinary shares." *See* Pl. Br. at 3 (emphasis added); Campolieti Decl. ¶ 49; Aerolíneas Bylaws Art. 10 (Campolieti Decl. Ex. 31). The Republic holds Class A and C shares in Aerolíneas, which under the Aerolíneas' Bylaws can only be held by the Republic, its branches, or its agencies, precluding any transfer to a U.S. bank or other private party. Campolieti Decl. ¶¶ 41, 50. Aerolíneas' Bylaws do not provide for the transfer or sale of the Class A and C shares to a private party. *Id.* Indeed, Aerolíneas' Bylaws specifically void any such transfer, making the turnover that Bainbridge seeks unworkable. *Id.* ¶ 54, Ex. 31; Aerolíneas Bylaws Art. 11 (Campolieti Decl. Ex. 31).

II.     **FOREIGN-SOVEREIGN PROPERTY LOCATED OUTSIDE THE UNITED STATES IS IMMUNE FROM TURNOVER**

> A.     **Federal Common Law Immunizes All Foreign-Sovereign Property Located Outside the United States, Which Is Unchanged By The FSIA**

To the extent the property targeted by Bainbridge exists, it is located outside of the United States, as Bainbridge concedes. *See* Pl. Br. at 10 (asking the Court to "order the Republic to bring the Bank Assets and the Airline Assets *into* the United States.") (emphasis added).   In the YPF Turnover Order, this Court held that it could order the Republic to bring in property located outside of the United States for turnover to Bainbridge. *See* Dkt. No. 189 at 23–24.   However, that holding is at odds with long-standing principles of sovereign immunity.

For 200 years, federal common law provided foreign sovereign property with absolute immunity from execution. *See, e.g., Walters v. Indus. & Com. Bank of China, Ltd.,* 651 F.3d 280, 289 (2d Cir. 2011) (before the FSIA, "property of foreign states was absolutely immune from execution"—whether within or outside the United States—as a matter of federal common law) (quoting *De Letelier v. Republic of Chile*, 748 F.2d 790, 799 (2d Cir. 1984)); *New York & Cuba Mail S. S. Co. v. Republic of Korea*, 132 F. Supp. 684, 686 (S.D.N.Y. 1955) (supporting the principle that "property of a foreign government is immune from attachment" "is so well established that . . . its applicability here could hardly be open to doubt").   The FSIA partially lowered this immunity for certain sovereign property in the United States. *See* 28 U.S.C. § 1609 (providing that "property *in the United States* of a foreign state shall be immune from attachment arrest and execution" subject to certain enumerated exceptions) (emphasis added); 28 U.S.C. § 1610(a), (b) (exceptions for the "property *in the United States* of a foreign state" or "property *in the United States* of an agency or instrumentality of a foreign state") (emphases added).   But in allowing for limited execution on foreign-sovereign property in the United States, Congress did not silently abrogate the longstanding rule prohibiting execution on foreign-sovereign property

outside the United States.  *See* H.R. Rep. No. 94-1487, at 26–27 (1976) (Congress recognizing in enacting the FSIA that the "current practice" and "traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution").

Accordingly, the Second Circuit has repeatedly affirmed in recent years that foreign sovereign assets outside the United States are categorically immune from judgment execution.  *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("[A] district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries."); *Walters*, 651 F.3d at 297 ("China's assets *outside* of the United States" are "categorically immune from execution under the FSIA."); *Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("[P]roperty that is subject to attachment and execution must be 'property in the United States of a foreign state' . . . ."); *see also Levin v. Bank of N.Y.*, No. 09-cv-5900, 2022 WL 523901, at *3 (S.D.N.Y. Feb. 21, 2022) ("[C]ourts in this circuit and elsewhere have uniformly held or confirmed that a foreign state's property located abroad is immune under the FSIA . . . .").[3]

That the FSIA created a detailed regime for property in the United States—but does not mention property outside the United States—confirms that Congress left in place the existing common-law immunity for sovereigns' non-U.S. property.  Under traditional statutory-interpretation principles, "the expression of one is the exclusion of others."  *United States v. Wells Fargo Bank*, 485 U.S. 351, 357 (1988).  Moreover, Congress "legislates against a background of

---

[3] Other federal appellate courts have uniformly held the same.  *See Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1132 (9th Cir. 2010) (Property not "in the United States" is "immune from execution."); *Autotech Techs. LP v. Integral Rsch. & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property . . . wherever . . . located around the world."); *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002) ("[C]ourts in the U.S. may execute only against property that meets the[] two statutory criteria," including that it be "in the United States . . . ."); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) (FSIA "does not empower United States courts to levy on assets located outside the United States.").

common-law adjudicatory principles, and it expects those principles to apply except when a statutory purpose to the contrary is evident." *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 572 (2021) (citation modified). Thus, "to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation modified). Here, Congress enacted the FSIA against a background of longstanding common law that foreign-sovereign property, both inside and outside the United States, was absolutely immune from execution. Congress specified that in certain circumstances, foreign-sovereign property inside the United States would no longer be immune. But it did not "speak" at all, much less "directly," to foreign-sovereign property abroad. *See Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1234 (2d Cir. 1995) (FSIA "did not alter" the "accepted" federal-common-law rule that "the property of foreign sovereigns was absolutely immune from attachment," "other than to create the exceptions contained in §§ 1610–1611."); *see also Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 280 (2023) ("[A] suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law.'") (quoting *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010)).

A reading that limits the FSIA's reach to foreign-sovereign property inside the United States is also consistent with the "longstanding principle of American law" that federal statutes are presumed to "apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (citation modified). In addition, it accords with the requirement that courts avoid construing federal statutes "to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804). "[A]t the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the

merits of an action." *Conn. Bank of Com.*, 309 F.3d at 255–56.  Both "the 1945 charter of the United Nations and the 1972 enactment of the European Convention [on State Immunity]. . . left the availability of execution totally up to the debtor state." *De Letelier*, 748 F.2d at 799.  Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property." *Conn. Bank*, 309 F.3d at 252.  If Congress had intended to upturn international law, it would have said so outright.  *See Autotech Techs. LP*, 499 F.3d at 750 ("We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction.").

Construing the FSIA to leave in place the common-law immunity for foreign-sovereign property abroad is also necessary to avoid absurd results.  If Congress had silently eliminated execution immunity, except as outlined in FSIA Section 1609 for U.S.-located property, then the immunity regime would be upside-down: foreign-sovereign property in the United States would often be immune from execution, subject to the FSIA's narrow statutory exceptions, but property in the foreign sovereign's own territory would have no immunity.  As the U.S. Government has explained, "[i]t would make no sense to conclude that Congress meticulously delineated the circumstances under which execution (and attachment in aid of execution) on foreign-state-owned assets in the United States would be allowed, but, through its silence, abandoned all such limits for assets located abroad."  Br. for the U.S. as *Amicus Curiae* at 10–11, *Bainbridge Fund Ltd. v. Republic of Argentina*, No. 25-1686 (2d. Cir. Oct. 2, 2025), Dkt.  No. 56.1 (Boccuzzi Decl. Ex. D).

The Court's contrary ruling in the YPF Turnover Order relied upon *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 94 & n.23 (2d Cir. 2017), *see* YPF Turnover Order at 27 n. 26, but *Peterson* is no longer good law.  After an intervening statutory amendment, the Supreme Court vacated the panel decision and remanded.  *Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813

(2020).   On remand, the Second Circuit chose not to "reinstate [its] analysis" that foreign-sovereign property abroad lacked execution immunity.  *Peterson v. Islamic Republic of Iran*, 963 F.3d 192, 196 (2d Cir. 2020).  In any event, *Peterson* is distinguishable.  It did not purport to direct a foreign sovereign to bring assets held in its own country into the United States:  It was directed to a "non-sovereign third party" (a Luxembourg financial institution) and sought the transfer of sovereign assets held in a third-party country.  *Peterson*, 876 F.3d at 94–5.

Moreover, and critically, *Peterson* rested on a misinterpretation of *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014).  *NML* addressed only the "single, narrow question" of whether the FSIA implied a separate "discovery-in-aid-of-execution immunity" for a foreign sovereign's extraterritorial assets—not any request to actually execute on such assets.  *NML*, 573 U.S. at 136, 140, 144.   *Peterson* quoted NML's general statements that the FSIA is "comprehensive," and that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text."  *Peterson*, 876 F.3d at 89 (quoting *NML*, 573 U.S. at 141–42).  But the Supreme Court's later *Halkbank* decision confirms that the FSIA did not abrogate all common-law immunity.[4]  *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 280 (2023).  The Supreme Court has since called for the views of the Solicitor General on the propriety of the "attachment of and execution against property of a foreign sovereign located outside the United States," demonstrating that it does not view *NML* as having resolved the question.  *See* Br. for the U.S. as *Amicus Curiae* at 1, *Clearstream Banking S.A. v. Peterson*, Nos.

---

[4] *NML* also observed that the parties had "cite[d] no case holding that, before the [FSIA], a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts" and assumed that U.S. courts "generally lack authority in the first place to execute against property in other countries," so the immunity question would not "ever have arisen." *NML*, 573 U.S. at 144.  However, as described *supra*, the Second Circuit and others have had occasion to address the issue, repeatedly holding that foreign-sovereign property outside the United States is absolutely immune from execution.

17-1529, 17-1534, 2019 WL 6715365 (Dec. 9, 2019), Dkt. No. 162-1 (Boccuzzi Decl. Ex. E).  In response, the U.S. Government stated its position that *NML* "did not hold that [foreign-held foreign-sovereign] assets are subject to execution in U.S. courts," *id.* at 13, an opinion that the U.S. Government emphasized in its amicus brief in support of the Republic in the YPF Turnover Order appeal.  *See* Br. for the U.S. as *Amicus Curiae* at 18, *Bainbridge Fund Ltd. v. Republic of Argentina*, No. 25-1686 (2d. Cir. Oct. 2, 2025), Dkt. No. 56.1 ("*NML Capital* did not decide that the FSIA completely supersedes common-law execution immunity for assets located abroad.  To the contrary, the Supreme Court has recognized that when 'a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law.'") (citation omitted) (Boccuzzi Decl. Ex. D).

While this Court in the YPF Turnover Order found that foreign-sovereign property located abroad was not immune from execution, after *NML*, other courts have correctly continued to hold the other way.  In *Rubin v. Islamic Republic of Iran*, the Seventh Circuit held that property located in Iran was not subject to execution, because to be "even potentially subject to attachment and execution," property must be "within the territorial jurisdiction of the district court."  830 F.3d 470, 475 (7th Cir. 2016) (quoting *NML*'s observation that U.S. "courts generally lack authority in the first place to execute against property in other countries") (citation omitted).  And this Court, citing the same quote from *NML*, has reached the same conclusion.  *Levin*, 2022 WL 523901, at *2, *4 (bank account "immune from execution under the [FSIA] because it is located outside of the United States.").

## B.    The FSIA Independently Precludes Bainbridge's Turnover Request

The FSIA was "designed to maintain broad immunity from attachment of a sovereign's property."  *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 90 (2d Cir. 2014).

Under FSIA Section 1609, a foreign sovereign's U.S. property "is immune from attachment or execution unless the property fits within one of the limited exceptions enumerated in" Section 1610.  *Aurelius Cap. Partners*, 584 F.3d at 129–130.  Section 1610 permits execution only if a foreign state's property is (1) "in the United States" and (2) "used for a commercial activity in the United States."  28 U.S.C. § 1610(a).  Plaintiff has "the burden of demonstrating" that both of those criteria are met.  *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 816 (2d Cir. 2021).  Bainbridge fails to carry its burden on either requirement.

### 1. Section 1610(a)'s Requirement Of Property "In The United States" Is Not Satisfied

Bainbridge concedes that the property at issue is not "in the United States."  *See* Pl. Br. at 10 (requesting the Court to "order the Republic to bring the Bank Assets and the Airline Assets *into* the United States.") (emphasis added).  That alone bars turnover under the FSIA.

In the YPF Turnover Order, the Court held that this requirement can be satisfied by Court-ordered delivery of property into the United States.  Dkt. No. 189 at 12–13, 24 n.24.  But if a U.S. court must first order the property to be brought here, that property cannot be deemed "[t]he property in the United States of a foreign state" subject to attachment or execution, as Section 1610(a) requires.  28 U.S.C. § 1610(a).  Every non-vacated decision of a court of appeals addressing this issue has treated the presence of foreign-sovereign property in the United States—before the involvement of a federal court—as a core Section 1610(a) requirement.  *See Rubin*, 830 F.3d at 475 (for foreign-sovereign property to be "even potentially subject to attachment and execution," one "basic criteria" is that property "must be within the territorial jurisdiction of the district court"); *Peterson*, 627 F.3d at 1131–1132 (property not "in the United States" is "immune from execution"); *Aurelius Cap. Partners*, 584 F.3d at 130 ("property that is subject to attachment and execution must be 'property in the United States of a foreign state'"); *Conn. Bank*, 309 F.3d

-15-

at 247 (holding "courts in the U.S. may execute only against property that meets the[] two statutory criteria," including that it be "'in the United States'").  As set forth by the U.S. Government in the YPF Turnover Order proceedings, interpreting this requirement as satisfiable through Court-ordered delivery of property into the United States would "render[] the FSIA's clear statutory prerequisite that foreign sovereign property be located in the United States a nullity."  U.S. Letter of Interest at 8, Dkt. No. 162.

Moreover, and critically, there can be no delivery into the United States here.  Regarding BNA, the Republic does not have an economic ownership interest that can be sitused, delivered, or turned over.  Campolieti Decl. ¶ 19.  As to the Aerolíneas Shares, any purported transfer of the Aerolíneas Shares to a private bank in New York would be in violation of Argentine law and therefore void under Aerolíneas' Bylaws.  *Id.* ¶¶ 49–54, 68.  Even under Bainbridge's theory that the Republic's ownership interest would qualify as a security entitlement if transferred to New York, Pl. Br. at 13-14, the Republic's Aerolíneas Shares would at all times remain in Argentina.

### 2. The Republic's Ownership Interests In BNA And Aerolíneas Are Not "Used For A Commercial Activity In The United States."

Bainbridge also fails to satisfy Section 1610(a)'s requirement that the assets be "used for a commercial activity in the United States."  28 U.S.C. § 1610(a).  The FSIA authorizes jurisdiction over a foreign sovereign based upon, among other things, "an act *outside* the territory of the United States *in connection with* a commercial activity of the foreign state elsewhere [if] that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2) (emphases added).  By contrast, under Section 1610(a)'s more limited exception, it is not enough if a foreign sovereign's property is merely used "*in connection with* a commercial activity or *in relation to* a commercial activity."  *Exp.-Imp. Bank*, 768 F.3d at 89 (citation omitted); *Walters*, 651 F.3d at 289 ("[T]he asymmetry between jurisdiction and execution immunity in the FSIA reflects a deliberate congressional

choice."). As the Court held in the YPF Turnover Order, Section 1610(a) requires that "*the Republic* must actively utilize [the Shares] in service of that commercial activity in the United States." Dkt. No. 189 at 17 (quoting *Exp.-Imp. Bank*, 768 F.3d at 90) (emphasis added) (citation modified); *see Rubin*, 830 F.3d at 480 ("A foreign state may lose its execution immunity only by *its own* commercial use of its property in the United States.")

In the YPF Turnover Order, the Court found that "YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors under SEC Rule 144A, all constitute 'commercial activity in the United States.'" Dkt. No. 189 at 17. The Court further held that the Republic's approval as a shareholder of YPF's "international debt issuances and the delisting of its shares from the NYSE" constituted use of the Republic's YPF shareholding for such commercial activity in the United States. *Id.* at 20. The Republic's position is that such activity does not satisfy Section 1610(a)'s requirements, but even setting aside that disagreement, there are no such facts here. Bainbridge states only that (a) the Republic is the majority owner of BNA and Aerolíneas, and (b) BNA's operation of bank branches in Miami and New York and Aerolíneas' operation of flights out of Miami International Airport constitutes commercial activity in the United States, conclusorily asserting that these two statements are linked. Pl. Br. at 3–4, 9. Those assertions are insufficient to carry Bainbridge's burden.

*First*, purported commercial activity of BNA and Aerolíneas is not attributable to the Republic. Under Argentine law, BNA and Aerolíneas have their own legal personalities and operate independently from the Republic. Campolieti Decl. ¶¶ 10–13, 19–20, 44, 48. Under U.S. law, it is well-established that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." *See First Nat'l City Bank v. Banco Para El Comercio*

*Exterior de Cuba*, 462 U.S. 611, 627 (1983).  Attributing the commercial activities of a company to a parent state, without an alter ego showing or any piercing of the corporate veil, "would expose foreign states to far greater liability than was originally contemplated under the [FSIA]."  *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 23 (D.D.C. 1999); *see Seijas v. Republic of Argentina*, No. 04 Civ. 400 (TPG), 2009 WL 10700009 (S.D.N.Y. Aug. 19, 2009) (no alter ego relationship between the Republic and Aerolíneas despite Republic's near 100% ownership of Aerolíneas stock); *see also Seijas*, 502 F. App'x at 22 (no alter ego relationship between the Republic and BNA).[5]

*Second*, Bainbridge describes purported commercial activity of BNA and Aerolíneas but does not show any "use" of the property at issue by the Republic for that commercial activity, making only conclusory assertions, Pl. Br. at 3–4.  *See Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d at 131 (under Section 1610(a), the property "*in the hands of the Republic* must have been 'used for a commercial activity'" and the commercial activities of other entities "are irrelevant"); *cf.* Bainbridge's YPF Turnover Motion at 4–5, Dkt. No. 107 (alleging Republic used its majority shares to cause YPF to: (1) solicit U.S. investment in its Class D shares through repeated filings with the U.S. Securities and Exchange Commission ("SEC"); (2) maintain an SEC-registered ADR program so the shares can trade on the New York Stock Exchange; (3) register its ADSs representing interests in its Class D shares with the SEC; and (4) issue billions of dollars in debt securities to U.S. investors).  Bainbridge cannot show that the Republic votes its shares to direct commercial activity of BNA in the United States, because BNA does not have shares.

---

[5] As to BNA's purported "significant accumulation of assets in the United States," Pl. Br. at 5, Bainbridge ignores that these are funds owned by other entities held by BNA as a bank and further ignores the corresponding "liabilities" section of BNA's balance sheet.  *See* Boccuzzi Decl. Ex. B (BNA New York Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks) (showing total liabilities of over $541 million for BNA's New York branch).

Bainbridge also does not establish any link between the Republic's voting of Aerolíneas Shares at shareholders' meetings in Argentina and the flight operations on which Bainbridge relies.

Bainbridge cites *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 151–52 (3d Cir. 2019), Pl. Br. at 8–9, but there Venezuela, through its alter ego PDVSA, voted PDVSA's shares in its wholly owned *U.S. subsidiary*.  Voting the shares of a *U.S. company* constituted "using" those shares for commercial activity in the United States.  *Id.*  Likewise, in *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016), *vacated and remanded*, 830 F.3d 66 (2d Cir. 2016), Iran, though alter egos, used shares *in a New York entity* in New York.  Neither case helps Bainbridge where, as here, there is no alter ego showing, the Republic's only activity regarding Aerolíneas is voting of shares in a non-alter-ego, *non-U.S.* corporation outside of the United States, and there is no voting of shares at all regarding BNA. *See also Foremost- McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990) (cited in YPF Turnover Order at 18) (assessing jurisdictional immunity based on Iran's conduct— not the activities of the corporation it allegedly controlled—in "a corporate dispute between majority and minority shareholders").

### C.    New York Law Does Not Authorize Forced Transfer Of Foreign-Sovereign Property Located Abroad

Although New York courts have construed C.P.L.R. Section 5225 to apply extraterritorially, none has applied it to *foreign-sovereign* property abroad, apart from the YPF Turnover Order.  *See* Pl. Br. at 11 (citing *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 830 (N.Y. 2009) (involving property of private individual); *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 836 N.Y.S.2d 4, 13–14 (N.Y. App. Div. 2007) (same); *Inter-Reg'l Fin. Grp., Inc. v. Hashemi*, 562 F.2d 152, 154–55 (2d Cir. 1977) (same)).  This is because federal common law would preempt New York's turnover statute if it purported to authorize the seizure of the

extraterritorial assets of a foreign sovereign. *See Boyle v. United Techs. Corp.,* 487 U.S. 500, 507 (1988) (federal law displaces state law when a "'significant conflict' exists between an identifiable 'federal policy or interest and the operation of state law'"). And separate statutory-construction principles—including a preference to avoid conflicts with established common-law rules and with principles of international comity—preclude reading C.P.L.R. Section 5225 that way. *See Motorola Credit Corp. v. Standard Chartered Bank*, 21 N.E.3d 223, 228–29 (N.Y. 2014) (holding *Koehler*, which authorized extraterritorial turnover, did not abrogate New York's common-law "separate entity rule," which "promotes international comity").

In the YPF Turnover Order, this Court held that the FSIA did not supersede C.P.L.R. Section 5225 because the FSIA spoke only to property "in the United States." YPF Turnover Order at 13. However, C.P.L.R. Section 5225 was enacted before the FSIA, at a time when foreign-sovereign property was absolutely immune from execution, making this Court's analysis of C.P.L.R. Section 5225 and the FSIA flawed. *See supra* Section II.A. Three years before the C.P.L.R.'s enactment in 1962, a New York court declined to order attachment of Soviet property, holding that it was "clear that this court may not assume jurisdiction over a foreign country or its property in any manner antagonistic to the policies of the United States," and that it "must honor and give full effect to the position taken in that connection by the Department of State of the United States" that the property was immune from execution. *Weilamann v. Chase Manhattan Bank*, 192 N.Y.S.2d 469, 472 (N.Y. Sup. Ct. 1959). New York construes its laws not to abrogate common-law immunity principles without a "clear and specific" statement to that effect. *Ezrasons, Inc. v. Rudd,* — N.E.3d —, 2025 WL 1436000, at *4 (N.Y. May 20, 2025). C.P.L.R. Section 5225 includes no such statement about its application to foreign-sovereign property.

Further, to permit C.P.L.R. Section 5225 to reach foreign-sovereign property abroad conflicts with principles of prescriptive comity.  Prescriptive comity is a "rule of statutory construction" that "cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws."  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164–65 (2004).  Under prescriptive comity, "a nation [or state] having some 'basis' for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction 'with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.'"  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 818 (1993).  Whether jurisdiction is "unreasonable" turns on, among other factors, "the extent to which the regulation is consistent with the traditions of the international system" and "the existence of justified expectations that might be protected or hurt by the regulation."  Restatement (Third) of Foreign Relations Law § 403(2)(d), (f).

Construing C.P.L.R. Section 5225 to reach foreign-sovereign property located outside the United States—as this Court did in the YPF Turnover Order—is unreasonable because it puts New York law in conflict with customary international law prohibiting the execution on sovereign property in the territory of another state.  *See* Restatement (Third) of Foreign Relations Law § 403(2)(f); *see also* Restatement (Fourth) of Foreign Relations Law § 432(b) (2018) ("Under customary international law, a state may not exercise jurisdiction to enforce in the territory of another state without the consent of the other state.").  As the U.S. Government has confirmed, "the United States recognizes that this principle reflects a widely accepted rule of customary international law."  U.S. Letter of Interest at 7, Dkt. No. 162.  It also "put[s] U.S. property at risk, given the potential for reciprocal adverse treatment of the United States in foreign courts."  *Id.* at 8.  State statutes, like federal statutes, must be interpreted "to avoid, where possible, 'producing

-21-

friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 184 (2021) (citation omitted). "[E]ven where the presumption against extraterritoriality does not apply, statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins.*, 509 U.S. at 815 (Scalia, J., dissenting); *see F. Hoffmann-La Roche Ltd.*, 542 U.S. at 164 (citing dissent in *Hartford Fire* with approval). In the YPF Turnover Order, this Court declined to evaluate the parties' arguments regarding international comity and C.P.L.R. Section 5225, relying instead in its decision in *Bainbridge Fund LTD v. Republic of Argentina,* 690 F. Supp. 3d 411 (S.D.N.Y. 2023). *See* YPF Turnover Order at 27 n.26. But that decision also did not evaluate international comity, and thus the Court should now consider the principles of international comity that require denial of this Motion.

### D.    Bainbridge's Proposed Creation Of A New "Securities Entitlement" Raises Additional Problems Under New York Law

Bainbridge asserts that the Court should order the Republic to transfer its ownership interests in BNA and Aerolíneas to a custody account at an unnamed "bank in New York" so that securities entitlements with a New York situs are created and can be turned over. Pl. Br. at 1, 13-14. That proposal creates a host of problems under New York law.

*First*, C.P.L.R. Section 5225 does not authorize courts to order a non-party bank to enter into a new commercial relationship. *See Trump v. CASA, Inc.*, 606 U.S. 831, 833 (2025) (courts have "consistently rebuffed requests for relief that extended beyond the parties"); *Havens v. James,* 76 F.4th 103, 111 (2d Cir. 2023) ("[A] court's jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court.") (citation modified); *Gregory v. Stetson,* 133 U.S. 579, 586 (1890) ("It is an elementary principle that a court cannot adjudicate

directly upon a person's right without having him either actually or constructively before it."); *Perkins v. Lukens Steel Co*., 310 U.S. 113, 123 (1940) ("The benefits of [the court's] injunction" improperly extended "to bidders throughout the Nation who were not parties to any proceeding, who were not before the court[,] and who had sought no relief."). The impermissibility of that overreach is exacerbated here, since the non-party bank would be entering a relationship in order to take actions that violate Argentine law. *See infra* Section III.A; Campolieti Decl. ¶¶ 65–68; *see also* Br. for Bank Policy Institute as *Amicus Curiae* at 23, *Petersen Energía Inversora, S.A.U. et al v. Argentine Republic*, No. 25-1687 (Oct. 2, 2025), Dkt. No. 89.1 (ordering non-party New York banks to act in violation of foreign law despite comity considerations would jeopardize the interest of the U.S. and New York in preserving New York as an international financial powerhouse) (Boccuzzi Decl. Ex. F).

*Second*, New York law provides for turnover of an asset in the possession or custody of the debtor, not a multi-step process for the creation of new property for turnover. C.P.L.R. § 5225(a) (requiring "that the judgment debtor [be] in *possession or custody*" of the property at issue) (emphasis added). To the extent New York-sitused securities entitlements can be created as Bainbridge proposes, those securities entitlements do not yet exist, and accordingly the Republic is not in actual possession of them. *See Goldberg & Connolly v. Xavier Const. Co*., 94 A.D.3d 1117, 1118 (2012) (denying turnover motion due to lack of actual possession); *Rothbard v. Jenkins*, 197 N.Y.S.2d 784, 785–86 (Sup. Ct. 1959) (denying turnover where assets were not in debtor's physical possession). As New York's highest court has held, "'possession or custody' requires actual possession," not merely "constructive possession" or "control." *See Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com.*, 21 N.Y.3d 55, 61, 64 (2013) (C.P.L.R. § 5225 allows for turnover order directing garnishee to "deliver assets already within its possession").

Bainbridge cites no case in which C.P.L.R. Section 5225 was used to require the creation of new property for turnover.

*Third*, C.P.L.R. Section 5201(c), which specifies the appropriate garnishee for various kinds of property, does not apply to motions such as this one which seek turnover not from a garnishee but directly from the judgment debtor. *See* Pl. Br. at 12–13. The C.P.L.R. defines garnishee as "a person *other than* the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest." C.P.L.R. § 105(i) (emphasis added). Additionally, C.P.L.R. Section 5201(c) applies to securities (certificated or not); as explained above, in the case of BNA the Republic does not own or hold any shares or securities, making C.P.L.R. Section 5201(c) and N.Y. U.C.C. Section 8-112—which similarly discusses securities and security entitlements—inapplicable here.

These unworkable and unauthorized procedures are the inevitable consequences of misconstruing New York's law to cover foreign-sovereign property located abroad.

## III.    BAINBRIDGE'S TURNOVER REQUEST VIOLATES INTERNATIONAL COMITY AND THE ACT-OF-STATE DOCTRINE

### A.    Bainbridge's Request For Turnover Directly Conflicts With Argentine Law

It is "well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)); *see Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995) (same); *see also Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) (recognizing fundamental principles of international comity dictate courts "should not take such action as may cause a violation of the laws of a friendly neighbor"). "[C]omity principles" require consideration of "legal obligations pursuant to foreign law before compelling" compliance with a U.S. court order. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 139

(2d Cir. 2014). These obligations are borne of the U.S.'s own interest in receiving similar treatment abroad and maintaining friendly relations with other nations. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 183 (2017); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35–36 (1945) ("The judicial seizure of the property of a friendly state may be regarded as such an affront to its dignity and may so affect our relations with it."). And, as the U.S. Government itself recently warned, granting a turnover order against property of a foreign sovereign located abroad, including in its own territory, "could in turn put U.S. property at risk, given the possibility of reciprocal adverse treatment of the United States in foreign courts." Br. for the U.S. as *Amicus Curiae* at 20, *Bainbridge Fund Ltd. v. Republic of Argentina*, No. 25-1686 (2d Cir. Oct. 2, 2025), Dkt. No. 56.1 (Boccuzzi Decl. Ex. D).[6]

A grant of Bainbridge's turnover request would require the Republic to violate its own laws on its own soil, in violation of principles of international comity. Argentine law forbids the transfer of the Aerolíneas Shares to private parties, specifying that only the Republic, its branches, or its agencies can hold these classes of shares. Campolieti Decl. ¶¶ 41, 50. Moreover, transfer to a private party of entities within the Argentine national public sector, including both BNA and Aerolíneas, requires authorization from the Argentine Congress. *Id.* ¶¶ 50–54, 68. Undertaking such a transfer where, as here, there is no such Congressional authorization would be unconstitutional and strictly forbidden. *Id.* ¶¶ 54, 65–68. Thus, ordering turnover from the Republic to a New York bank, and from that bank to Bainbridge, would require the Republic and

---

[6] Comity principles continue to apply after the FSIA's enactment. Even *Peterson*, which wrongly held that federal common law did not bar execution on foreign-sovereign property outside the United States, *see supra* Section II.A, recognized international comity as an independent "barrier" against a "'court order [that] will infringe on sovereign interests of a foreign state.'" 876 F.3d at 94 & n.23; *cf. NML*, 573 U.S. at 146 n.6 (in evaluating post-judgment discovery, "'other sources of law,'" including "comity interests," "ordinarily will bear on the propriety of discovery requests").

that bank to take action that is illegal as a matter of Argentine law. *See, e.g., Motorola*, 388 F.3d at 60; *Trade Dev. Bank v. Cont'l Ins. Co.,* 469 F.2d 35, 41 (2d Cir. 1972) (refusing to require bank to disclose customer names in violation of Swiss law).

In the YPF Turnover Order, the Court recognized these issues and set out certain alternatives in response. YPF Turnover Order at 27–28. But those alternatives confirm, rather than obviate, the conflict between Argentine law and Bainbridge's turnover request. U.S. courts have no power to require "the legislature of a foreign sovereign" to "enact or change a law." *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 164–65 (2d Cir. 2001) (on mandamus, instructing court to omit language from order "require[ing] the German legislature" to amend its laws). To "so . . . trammel on the prerogatives of a legislature" is simply "beyond the authority" of the U.S. judiciary. *Id*. at 164; *see Liu v. U.S. Cong.*, 834 Fed. App'x. 600, 606 (2d Cir. 2020) ("[F]ederal courts lack the power to compel [even] the [U.S.] Congress to exercise its legislative powers."). That is because "each sovereign nation has the sole jurisdiction to prescribe and administer its own laws." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 79 (3d Cir. 1994) (vacating injunction regulating sovereign's conduct within its borders). The alternative of satisfying the judgment through a separate agreement fares no better, as an illegal order does not become legal simply because the parties may elect to settle out of Court.

### B.     Turnover Would Violate The Act-Of-State Doctrine

Turnover would also violate the act of state doctrine, which is a binding "principle of decision." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 138 (2d Cir. 2022) (citation omitted). Under the act of state doctrine, a U.S. Court may not "declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). The act-of-state doctrine thus "compels federal and state

courts to treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'" *Celestin*, 30 F.4th at 138.  It bars orders that would require a country to violate its own laws and thus have the practical effect of nullifying those foreign laws.  *See Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985) (requiring Mexico "to violate its own national law with respect to an obligation wholly controlled by [its own] law . . . would clearly be an impermissible 'inquiry into the legality, validity, and propriety of the acts and motivation of [a] foreign sovereign[]" acting within its own boundaries); *Credit Suisse v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 130 F.3d 1342, 1347 (9th Cir. 1997) (act-of-state doctrine foreclosed U.S. Courts from ordering Swiss bank to transfer funds in "direct contravention" of Swiss law because it would be tantamount to "'declar[ing] invalid the official act of a foreign sovereign.'").

Bainbridge's turnover request would do the same here, as it would require the Republic to ignore (or change) its own laws, effectively rendering them "null and void." *Kirkpatrick*, 493 U.S. at 406.

## CONCLUSION

For the reasons described above, Bainbridge's motion for turnover should be denied.

Dated: New York, New York
        November 26, 2025

CLEARY GOTTLIEB STEEN & HAMILTON LLP

_____
Carmine D. Boccuzzi, Jr. (cboccuzzi@cgsh.com)
Maria E. Manghi (mmanghi@cgsh.com)
One Liberty Plaza
New York, New York 10006
T: 212-225-2000

Rathna J. Ramamurthi (rramamurthi@cgsh.com)
2112 Pennsylvania Ave NW
Washington DC 20037
T: 202-974-1515

*Attorneys for the Republic of Argentina*

-27-

**CERTIFICATE OF COMPLIANCE**

I, Carmine D. Boccuzzi, Jr. hereby certify that this brief contains 8,998 words, excluding

the parts of the brief exempted by Local Rule 7.1(c).

Dated:  New York, New York
        November 26, 2025

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Carmine D. Boccuzzi, Jr.