**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

BAINBRIDGE FUND LTD.,

       Plaintiff,

v.                                               16 Civ. 08605 (LAP)

THE REPUBLIC OF ARGENTINA,

       Defendant.

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**<u>MOTION FOR TURNOVER</u>**

DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017
(212) 692-1000
*Counsel for Plaintiff Bainbridge Fund Ltd*

I.  **BAINBRIDGE HAS IDENTIFIED TRANSFERABLE PROPERTY THAT IS SUBJECT TO TURNOVER.**

Bainbridge identifies two ownership interests the Republic holds – in Banco de la Nación ("BNA") and in Aerolíneas Argentinas (the "Airline") – that are subject to turnover under the FSIA. The Republic argues that Bainbridge has not identified transferable property that is subject to turnover because: (1) the Republic does not have shares in BNA; and (2) its interests in the Airline consist solely of "nontransferable ordinary shares." Arg.Opp at 16.

Given the Republic's broad contractual waivers, which are expressly applicable to "any revenues, assets, or properties [the Republic] <u>has or may have ownership interest in</u>," ECF No. 53-4 at 58 (emphasis added), Bainbridge has identified property that is subject to turnover.

A. <u>The Republic's ownership interest in BNA is transferable.</u>

The Republic's arguments concerning its lack of ownership interest in BNA are remarkable, given that the language of the waiver quoted above extends to any "ownership interest" the Republic "has or may have."

While the Republic claims that it "does not have an ownership interest in BNA, in the form of shares or in any other form," Arg.Opp. at 16, this claim ignores the fact that BNA is wholly owned and controlled by the Republic. According to the

1

Bank's Organic Charter,[1] BNA's "transactions are guaranteed by the Argentine Nation" and BNA's governing body consists of a President, Vice-president, and directors who are "appointed by the National Executive Branch." *See BNA Charter* at Arts. 2; 10; 12. As part of the national administration, BNA has no choice but to follow the dictates of the government and refrain from performing actions contrary to national policy. Clearly, such control represents an ownership interest, whether that interest consists of stock or some other ownership form.

This Court noted earlier in this case that the process of privatization "necessarily involve[s] the transfer of [shares]." *YPF Turnover Order* at 22. The Republic's most recent 18-K filing[2] concedes that "[i]n February 2025, the Government enacted a decree converting [BNA] into a limited company, marking the initial step toward its potential privatization. Despite this structural change, as of the date of this Annual report, the Argentine state retained ownership of 99.9% of [BNA's] share capital, with the remaining 0.1% held by Banco Nación Foundation." *See Republic of Argentina's 2025 18-K filing* ("*Rep. 2025 18-K*") at D-7. The law of the case doctrine "forecloses re-litigation of issues expressly or impliedly decided by the court" during prior proceedings in the same case. *Vista Food Exchange, Inc.*

---

[1] Accessed at: https://www.bna.com.ar/Downloads/CartaOrganicaVersionIngles.pdf.
[2] The Republic's 2025 18-K, filed on October 31, 2025, after Bainbridge filed its instant motion. Accessed at:
https://www.sec.gov/Archives/edgar/data/914021/000119312525260925/d90705dex99d.htm.

2

*v. Lawson Foods, LLC*, 17-cv-07454, 2020 WL 7022461 at *6 (S.D.N.Y. Nov. 30, 2020) ("*Vista*"). This Court has recognized that "[a]bsent 'cogent or compelling reasons,' the law of the case controls." *Id.*

    B. <u>The Republic's interests in Aerolíneas Argentinas are transferable.</u>

The Republic concedes that it holds both Class A and Class C shares in the Airline but argues that the shares are not transferable because under the Bylaws, those shares "can only be held by the Republic, its branches, or its agencies," and thus cannot be subject to a turnover order entered by this Court. *See* Arg.Opp. at 16. While this argument may fall short of an "act of state" argument, it is addressed in Section (V)(B) *infra*.

According to the Republic's most recent 18-K, the passage of Law No. 21,4999, or the "Argentine Expropriation Law," "declare[d] that the shares of Aerolíneas Argentinas . . . were 'of public interest' and therefore subject to expropriation." *See Rep. 2025 18-K* at D-52. Since then, the Milei administration has formally declared the Airline "to be 'subject to privatisation.'"[3]

More recently, in April of 2025 the Milei administration has voiced its commitment to privatizing the Airline, as presidential spokesperson Manuel Adorni stated during a press conference that "balancing the books at Aerolíneas Argentinas

---

[3] Accessed at: https://www.batimes.com.ar/news/economy/milei-declares-state-owned-aerolineas-argentinas-subject-to-privatisation.phtml.

3

. . . . was 'a necessary step towards [its] inevitable privatization.'"[4] As this Court has recognized , such privatization constitutes "a process that would necessarily involve the transfer of the [s]hares." *See* ECF No. 189 ("*YPF Turnover Order*") at 22.

And as explained in Part I(A) *supra*, any argument by the Republic that its interests are non-transferable is foreclosed by the law of the case, as this Court has already ruled that such privatization would necessarily involve transfer of the shares. *See YPF Turnover Order* at 22; *Vista*, 2020 WL 7022461 at *6.

## II. FOREIGN SOVEREIGN PROPERTY LOCATED OUTSIDE THE UNITED STATES IS NOT IMMUNE FROM TURNOVER UNDER NEW YORK LAW.

Next, the Republic repeats its tired argument that because its ownership interests in BNA and the Airline are held outside of the United States, those interests are absolutely immune from attachment and execution under federal common law and the FSIA. However, this Court has twice found the opposite and those orders constitute the law of the case. *See generally* ECF No. 95; *YPF Turnover Order*.

   A. <u>Federal common law, to the extent it exists at all, is superseded by FRCP Rule 69(a)'s prescription that state law applies to the procedure on turnover and execution here.</u>

The law of the case controls here. *See Vista*, 2020 WL 7022461 at *6. This Court has already found that any supposed federal common law does not supersede application of New York law, which governs the procedure on execution as to foreign

---

[4] Accessed at: https://buenosairesherald.com/business/aerolineas-argentinas-announces-it-wont-need-state-funding-in-2025.

sovereign assets held abroad. To the extent this Court wishes to revisit the Republic's exhausted argument, ample support for Bainbridge's position is found in *Republic of Argentina v. NML Cap.*, 573 U.S. 134 (2014), which explicitly held that "[t]he FSIA replaced an executive-driven, factor-intensive, loosely common-law based immunity regime with 'a comprehensive framework for resolving any claim of sovereign immunity.'" *Id.* at 135 (*quoting Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004) (emphasis added)).

B. The FSIA does not preclude Bainbridge's request for turnover.

Pursuant to 28 U.S.C. § 1610(a)(1),[5] "any property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . . if the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication. . . ."

The Republic argues that the property sought by Bainbridge cannot be turned over pursuant to court order because the property is neither "in the United States" nor "used for a commercial activity in the United States." Arg.Opp. at 23. However, the Republic's argument here fails at both turns.

---

[5] The Foreign Sovereign Immunities Act (the "FSIA") is codified at 28 U.S.C. §§ 1602-11.

*1. A turnover order is not precluded by the fact that the Republic's ownership interests in BNA and the Airline are currently held outside the United States.*

First, courts are discouraged from allowing parties to "re-litigate" "issues. . . [previously] decided by the court." *Vista*, 2020 WL 7022461 at *6. This Court has already established in earlier phases of this litigation that the FSIA "by its plain terms. . . applies only to property in the United States" and the Court of Appeals has "disavowed 'the many cases cited by the defendants for the proposition that a foreign sovereign's extraterritorial assets are absolutely immune from execution.'" *Bainbridge Fund, Ltd. v. Republic of Argentina*, 690 F. Supp. 3d 411, 416 (S.D.N.Y. 2023) (*quoting Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 90 (2d Cir. 2017)) ("*Peterson II*").

And while the Republic urges this Court to ignore *Peterson* – and this Court's prior application of *Peterson* – as if neither happened, that argument has already been rejected by the Court of Appeals. The Second Circuit continues to recognize the validity of *Peterson II*. Just last year, in *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), the Second Circuit stated that it "vacated the judgment of the district court with respect to subject matter jurisdiction" only and that "the 'FSIA does not by its terms provide execution immunity to a foreign sovereign's extraterritorial assets. . ." *Id.* at 992 (*quoting Peterson II*, 876 F.3d at 90–91). *See also Foley v. Union de Banques Arabes et Françiases*, 683 F. Supp. 3d 375, 392 (S.D.N.Y. 2023),

6

*reconsideration denied*, 22-cv-1682 (ER), 2023 WL 6541775 (S.D.N.Y. Sept. 1, 2023).

2. *The Republic uses its ownership interests in BNA and the Airline "for a commercial activity in the United States."*

Given the broad waivers assented to by the Republic, the only outstanding inquiry concerns whether BNA and the Airline engage in commercial activity in the United States. As explained in Bainbridge's opening brief, the Bank and the Airline engage in regular and continuous commercial activity in the United States. ECF No. 213 at 8–9.

The Republic concedes through its most recent 18-K that it "carries out certain functions and commercial activities through state-owned and state-controlled enterprises, including . . . [BNA]." *Rep. 2025 18-K* at D-51. According to BNA's Charter, its activity is "coordinate[d] . . . with the economic and financial policies implemented by the National Government." *BNA Charter* at Art. 1.[6] And according to BNA's website, BNA "carries out its international activity, both commercial and financial, supported by a network made up of eleven operating subsidiaries in six countries," including U.S. branches in New York and Miami, which "sustain and promote the activity abroad of the Argentine export sectors."[7] Arg.Opp. at 3. Through this commercial activity, each of the New York and Miami branches of

---

[6] Accessed at: https://www.bna.com.ar/Downloads/CartaOrganicaVersionIngles.pdf.
[7] Accessed at: https://www.bna.com.ar/Institucional/TrayectoriaInternacional.

7

BNA have been able to accumulate sizable assets.[8] This sufficiently establishes BNA's substantial commercial activity in the United States through actions that—at the very least—occur as the result of the Republic's tacit approval, if not outright direction.

Like BNA, the Republic concedes in its 18-K that it "carries out certain functions and commercial activities through state-owned and state-controlled enterprises, including . . . [the Airline]." *See Rep. 2025 18-K* at D-51. As Bainbridge's opening brief explained, the Airline engages in regular commercial activity in the United States through its continued operation of flights between Miami and Buenos Aires. Additionally, the Airline's decision to cut flights to the United States, like many other operational decisions concerning the Airline, were made "at the directive of a new libertarian government under President Javier Milei" to "trim the airline's burden on the state."[9]

### III. NEW YORK LAW AUTHORIZES TURNOVER OF FOREIGN SOVEREIGN PROPERTY LOCATED ABROAD.

A. <u>The Republic ignores a meaningful distinction between turnover and execution.</u>

The Republic argues that New York law does not authorize "the <u>forced transfer</u> of foreign sovereign property located abroad." Arg.Opp. at 19. (emphasis

---

[8] *Id.*

[9] Accessed at: https://simpleflying.com/aerolineas-argentinas-downsizes-advance-privatization/#:~:text=These%20decisions%2C%20made%20in%20the,:%20Lukas%20Souza%20%7C%20Simple%20Flying.).

8

added). As a threshold matter, the couched issue statement included in the Republic's opposition brief demonstrates its misunderstanding of the central issue here. *Id.* The Republic fails to distinguish between an order for turnover and an order for execution. A turnover order stops short of the "forced transfer" claimed by the Republic. A turnover order does not, contrary to the Republic's purported position, involve any "judicial seizure of the property." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945). Instead, a turnover order empowers a court to "compel observance of its decrees by proceedings *in personam* against the owner." *Koehler*, 12 N.Y.3d at 539.

  B. <u>New York law empowers a court to order a person over which it has *in personam* jurisdiction to bring particular assets held outside of New York into New York as part of a proceeding in aid of execution.</u>

The Republic's argument is foreclosed by this Court's YPF Turnover Order pursuant to the law of the case doctrine. *See Vista*, 2020 WL 7022461 at *6. To the extent that this Court wishes to revisit the Republic's exhausted argument, support for Bainbridge's position is found in *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024) and *Foley*, 683 F. Supp. 3d at 392.

Finally, the Republic's contention that a foreign sovereign should be treated differently than any other non-sovereign judgment debtor is foreclosed by *Attestor Master Value Fund LP v. Argentina*, where the Second Circuit affirmed this Court's order directing the [garnishee] to turn over the Republic's reversionary interests

9

represented by collateral held in Germany and Switzerland, finding it had the power to do so because it had personal jurisdiction over the person holding the funds. 113 F.4th 220, 234 (2d Cir. 2024). As the Second Circuit explained, to differentiate sovereigns from natural persons "would cut them out of a normal part of civil litigation—judgment enforcement. . ." *Id.* See also *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012).

### IV. BAINBRIDGE'S SUPPOSED CREATION OF A NEW "SECURITIES ENTITLEMENT" IS CONSISTENT WITH THIS COURT'S TURNOVER ORDER PREVIOUSLY ENTERED.

The Republic argues that "creation" of a security entitlement "creates a host of problems under New York law," including: (i) N.Y. C.P.L.R. § 5225 "does not authorize courts to order a non-party bank to enter into a new commercial relationship;" (ii) "New York law provides for turnover of an asset in the possession or custody of the debtor, not a multi-step process for the creation of new property for turnover;" and (iii) N.Y. C.P.L.R. § 5201(c) "does not apply to motions such as this one which seeks turnover not from a garnishee but directly from the judgment debtor." Arg.Opp. at 30–32. The Republic is mistaken for several reasons.

First, nothing in the proposed turnover order would "order a non-party bank to enter into a new commercial relationship." In fact, a turnover order issued here would not require any bank to take any action because the order is directed to the

10

Republic, not a bank. This Court has *in personam* jurisdiction over the Republic, and it can direct the Republic to bring an asset into the United States.

Second, the proposed turnover order would not "creat[e] new property for turnover" through some "multi-step process" as the Republic claims. Arg.Opp. at 31. Instead, the Republic's ownership interests in BNA and the Airline constitute a "security" under N.Y. U.C.C. § 8-102(a)(15), which defines a "security" as a "share, participation, or other interest in an issuer or in property or an enterprise of an issuer." N.Y. U.C.C. § 8-102(a)(15). The Republic's assent to the broad waivers reinforces recognition of the Republic's ownership assets here, as the Republic waived its immunity as to "any revenues, assets, or properties [the Republic] has or may have ownership interest in," ECF No. 53-4 at 58. This Court has already recognized that the Republic has "waived its immunity from execution" through these waivers, *see YPF Turnover Order* at 21, which constitutes the law of the case here. *See Vista*, 2020 WL 7022461 at *6. This waiver is broad enough to encompass the Republic's interests in BNA and the Airline here, rendering those interests to be "securities" under the U.C.C.

Finally, in ordering the Republic, a party over which it has personal jurisdiction, to bring its ownership interests, *i.e.* securities, to New York by depositing them into a global custody account with a New York situs, there is no "creation of new property for turnover." Arg.Opp at 31. And as the Second Circuit

11

recognized in *NML Cap., Ltd. v. Republic of Argentina*, a "federal court sitting as a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere." 699 F.3d 246, 263 (2d Cir. 2012).

In the YPF Turnover Order, this Court recognized that, although the shares at issue initially had an Argentina situs, the Republic's delivery of those shares to a global custody account at BNYM would mark the moment that "the Republic's ownership interest in the [s]hares w[ould] qualify as security entitlements." *YPF Turnover Order* at 25. Then, those "security entitlements will have a New York situs, because the global account will be held at the New York office of BNYM." *Id.* (*citing* N.Y. U.C.C. §§ 8-102(7), (17); N.Y. U.C.C. § 8-112, Official Cmts., ¶ 3).

N.Y. U.C.C. § 8-112(e) is designed to provide relief to judgment creditors that have otherwise been unable to enforce their valid judgments at no fault of their own. Under N.Y. U.C.C. § 8-112(e), Bainbridge is "entitled to aid from [this court] . . . in reaching the [property]" wherever the "property. . . cannot readily be reached by other legal process." N.Y. U.C.C. § 8-112(e). This entitlement to the court's assistance applies regardless of whether the property is characterized as a "security" or "security entitlement."

## V. BAINBRIDGE'S REQUEST DOES NOT VIOLATE INTERNATIONAL COMITY OR THE ACT OF STATE DOCTRINE.

Contrary to the Republic's assertions, neither comity nor the act of state doctrine proscribe turnover of the Republic's assets here. This Court has already concluded that comity considerations weigh in favor of granting Bainbridge's motion, and that prior finding constitutes the law of the case. *See YPF Turnover Order* at 29; *Vista*, 2020 WL 7022461 at *6. And since the district court's order has not declared any Argentine law invalid or otherwise void, the act of state doctrine is not at issue here. *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022).

A. <u>International comity does not counsel against turnover of the Republic's ownership interests in BNA and the Airline here.</u>

The Republic's comity arguments are foreclosed by the law of the case here. *Vista*, 2020 WL 7022461 at *6. In this Court's YPF Turnover Order, this Court found that international comity considerations "counsel[ed] in favor of granting" Bainbridge's request for turnover, explaining that "[c]omity is not a one-way street." There are no "compelling" or "cogent" reasons for this Court to revisit its prior ruling in this case.

13

B. <u>The act of state doctrine does not proscribe turnover of the Republic's ownership interests in the Airline here because turnover would not involve a declaration of invalidity as to any Argentine law.</u>

The Republic dedicates its final two paragraphs to the act of state doctrine to making the perfunctory argument that Bainbridge's turnover request would "require the Republic to ignore (or change) its own laws." Arg.Opp. at 35. The Republic provides no legal authority and merely asserts that Bainbridge's request "would require the Republic to ignore (or change) its own laws, effectively rendering them 'null and void.'" *Id.* (*citing W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)).

The Republic makes no effort to explain what laws would be violated. Presumably, the Republic is referring to its contention that the Republic's ownership interests in the Airline are not transferable pursuant to the Airline's Bylaws. However, this argument fails for the same reasons mentioned above and recognized as the law of the case here—if the Airline may be subject to expropriation, the Republic's interests in these entities necessarily must be transferable. *YPF Turnover Order* at 22.

As a threshold matter, it is questionable whether the Bylaws themselves qualify as a law of the Argentine National Government. Moreover, as explained above, a turnover order stops short of actual transfer of ownership of the property. Instead, it requires the Republic, a party that this Court has jurisdiction over, to bring

14

its property into New York so that any claims of immunity or other protections can be evaluated.

Assuming *arguendo* that: (1) the Bylaws did constitute an official act of the state *and* (2) a turnover order necessarily involves a transfer of ownership, the transfer restrictions found in the Airline's Bylaws apply to *voluntary* transfers only, not judicially ordered transfers. *See* Declaration of Alberto Bianchi ("Bianchi"), ECF No. 130-1 ¶¶ 4, 18. Any such restrictions therefore would have no effect on a court's power to order a transfer. *Id.*, ¶¶ 5, 11.

Moreover, this Court has already established as the law of the case here that "[t]here is no unavoidable conflict between Argentine law and Plaintiff's requested relief" because "the Republic has several choices it can legally pursue." *YPF Turnover Order* at 28. This Court explained that the Republic could, *inter alia*, "take action to change the law," or "satisfy the judgment through a separate agreement with Plaintiff." *Id.* at 28. Accordingly, this Court found no true conflict in-fact between N.Y. C.P.L.R. § 5225 and Argentine law. *Id.* at 29. Obviously, the same reasoning applies here, and the Court would undoubtedly entertain any other solutions the Republic might offer.

Put simply, this is unlike *Braka v. Bancomer, S.A.*, 589 F. Supp. 1465 (S.D.N.Y. 1984) or *Credit Suisse v. U.S. Dist. Court for Cent. Dist. Of California*, 130 F.3d 1342 (9th Cir. 1997), where the district courts ordered remedies in direct

15

violation of a foreign act. Granting Bainbridge's motion would not involve any declaration of invalidity of any Argentine law.

## CONCLUSION

For the foregoing reasons, Bainbridge respectfully requests this Court order turnover of the Republic's ownership interests in BNA and the Airline.

Respectfully submitted

_____
Anthony J. Costantini
David T. McTaggart
Jillian M. Dreusike
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Ave., 23rd Floor
(212) 692-1032
ajcostantini@duanemorris.com
*Counsel for Plaintiff Bainbridge Fund, Ltd.*

December 8, 2025

16

## **CERTIFICATE OF COMPLIANCE**

I, Anthony J. Costantini, certify that the forgoing Plaintiff's Reply Memorandum of Law in Further Support of Its Motion for Turnover complies with the word count limit set forth in Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York in that the word count of this Memorandum of Law, excluding the caption, table of contents, table of authorities, and signature block, contains 3,492 words.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum of Law.

December 8, 2025

                                                  *s/ Anthony J. Costantini*
                                                  Anthony J. Costantini